## LANZA *v.* NEW YORK.

No. 236. Argued April 2, 1962.—Decided June 4, 1962.

*Leo Pfeffer* and *Jacob D. Fuchsberg* argued the cause and filed briefs for petitioner.

*H. Richard Uviller* argued the cause for respondent. With him on the briefs was *Frank S. Hogan.*

MR. JUSTICE STEWART delivered the opinion of the Court.

On February 13, 1957, the petitioner paid a visit to his brother, who was then confined in a New York jail. The two conversed in a room at the jail set aside for such visits. Six days later the petitioner's brother was released from custody by order of one member of the State Parole

Commission, under rather unusual circumstances.[1] This prompted a committee of the New York Legislature to hold an investigation of possible corruption in the state parole system.[2]

During the course of the committee's investigation, the petitioner was called to testify. He appeared, accompanied by counsel. After granting the petitioner immunity from prosecution, as permitted by state law,[3] the committee directed him to answer several questions. For refusing to answer these questions the petitioner was indicted, tried and convicted under a provision of the criminal law of New York.[4] His conviction was affirmed on review by the New York courts.[5] We granted certio-

---

[1] Four parole officers had concurred in a report finding that the petitioner's brother was "not a fit subject for restoration to parole." This report had been endorsed by three superiors in the Division of Parole. Shortly after receiving these recommendations a member of the Commission ordered the petitioner's brother released.

[2] The committee was the Joint Legislative Committee on Government Operations, created by the New York Legislature in 1955. This committee was endowed with "full power and authority to investigate, inquire into and examine the management and affairs of any department, board, bureau, commission . . . of the state, and all questions in relation thereto . . . ." The committee was specifically authorized to investigate "the administration of state and local laws and the detection and prevention of unsound, improper or corrupt practices in connection therewith."

[3] New York Penal Law §§ 381, 584, 2447.

[4] New York Penal Law § 1330. "A person who being present before either house of the legislature or any committee thereof authorized to summon witnesses, wilfully refuses to be sworn or affirmed, or to answer any material and proper question, or to produce upon reasonable notice any material and proper books, papers, or documents in his possession or under his control, is guilty of a misdemeanor."

[5] The Appellate Division modified the judgment by directing that the terms imposed on the several counts of the indictment be served concurrently. 10 App. Div. 2d 315, 199 N. Y. S. 2d 598. The New York Court of Appeals modified the judgment further, holding that

rari, 368 U. S. 918, to consider the petitioner's claim that he could not constitutionally be punished for refusing to answer the questions put to him by the state legislative committee, because the conversation he had had with his brother in jail had been electronically intercepted and recorded by officials of the State, and a transcript of that conversation had furnished the basis of the committee's questions. For the reasons which follow, we hold that this constitutional claim is not valid, and we accordingly affirm the judgment before us.

The record does not make clear the precise circumstances under which the conversation in the jail between the petitioner and his brother was overheard and transcribed. The State concedes, however, that an electronic device was installed in the room at the Westchester County Jail where the two conversed on February 13, 1957, that without their knowledge their conversation was thereby overheard and transcribed by jail officials, and that a transcript of the conversation was in the hands of the legislative committee when the petitioner was summoned to testify.

The petitioner has not questioned the power of the state legislative committee to conduct an investigation into whether the state parole system was being administered honestly and evenhandedly, nor has he questioned the good faith or propriety of the particular investigation which gave rise to the present case. His argument is simply that the interception of the jail conversation was a violation of those principles of the Fourth Amendment which have found recognition in the Due Process Clause of the Fourteenth, that it was accordingly impermissible for the state legislative committee to make use of the transcript of that conversation in interrogating him, and

the petitioner had committed but a single crime in refusing to answer the various questions put to him by the committee. 9 N. Y. 2d 895, 216 N. Y. S. 2d 706, 175 N. E. 2d 833.

that New York therefore denied him due process of law by convicting him for refusing to answer the committee's questions.[6]

The Fourth Amendment specifically insures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," by federal officers. We may take it as settled that the Fourteenth Amendment gives to the people like protection against the conduct of the officials of any State. *Mapp* v. *Ohio,* 367 U. S. 643; *Elkins* v. *United States,* 364 U. S. 206; *Wolf* v. *Colorado,* 338 U. S. 25.

The petitioner's argument thus necessarily begins with two assumptions: that the visitors' room of a public jail is a constitutionally protected area, and that surreptitious electronic eavesdropping under certain circumstances may amount to an unreasonable search or seizure. As to the second there can be no doubt. This Court through the years has not taken a literal or mechanical approach to the question of what may constitute a search or seizure.[7] And as recently as last Term we specifically held that electronic eavesdropping by federal officers, accomplished by physical intrusion into the wall of a house, violated the

---

[6] The New York Court of Appeals made clear that it had passed upon this federal constitutional claim, and that its judgment was not based upon an independent state ground. Its amended remittitur was as follows:

"Upon the appeal herein there was presented and necessarily passed upon a question under the Constitution of the United States, viz.: Defendant argued that the imposition of penal sanctions for his refusal to answer certain questions deprived him of liberty without due process of law in violation of the Fourteenth Amendment. The Court of Appeals held that defendant's constitutional rights were not violated."

[7] *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385; *Zap* v. *United States,* 328 U. S. 624; cf. *Irvine* v. *California,* 347 U. S. 128, 132; see also *Nueslein* v. *District of Columbia,* 73 App. D. C. 85, 115 F. 2d 690; *McGinnis* v. *United States,* 227 F. 2d 598.

Fourth Amendment rights of the occupants. *Silverman* v. *United States,* 365 U. S. 505.

But to say that a public jail is the equivalent of a man's "house" or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument. To be sure, the Court has been far from niggardly in construing the physical scope of Fourth Amendment protection. A business office is a protected area,[8] and so may be a store.[9] A hotel room, in the eyes of the Fourth Amendment, may become a person's "house," [10] and so, of course, may an apartment.[11] An automobile may not be unreasonably searched.[12] Neither may an occupied taxicab.[13] Yet, without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day.[14] Though it may be assumed that even

[8] *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385; *Gouled* v. *United States,* 255 U. S. 298.

[9] *Amos* v. *United States,* 255 U. S. 313; *Davis* v. *United States,* 328 U. S. 582.

[10] *Lustig* v. *United States,* 338 U. S. 74; *United States* v. *Jeffers,* 342 U. S. 48.

[11] *Jones* v. *United States,* 362 U. S. 257.

[12] *Gambino* v. *United States,* 275 U. S. 310; *Carroll* v. *United States,* 267 U. S. 132; *Brinegar* v. *United States,* 338 U. S. 160; *Henry* v. *United States,* 361 U. S. 98.

[13] *Rios* v. *United States,* 364 U. S. 253.

[14] N. Y. Correction Law § 500-c provides, in part: "Convicts under sentence shall not be allowed to converse with any other person, except in the presence of a keeper."

The N. Y. State Commission of Correction, Regulations for Management of County Jails (Revised 1953 ed.), provide, in part:

"All parts of the jail should be frequently searched for contraband.

[*Footnote 14 continued on p. 144*]

in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection,[15] there is no claimed violation of any such special relationship here.

But even if we accept the premise that the room at the jail where the petitioner and his brother conversed was an area immunized by the Constitution from unreasonable search and seizure, and even though we put to one side questions as to the petitioner's standing to complain,[16]

---

"A thorough search should be made of all packages to prevent forbidden articles being smuggled into the jail. The number of articles permitted to be taken into the jail should be kept to a minimum. Saws have been secreted in bananas, in the soles of shoes, under the peaks of caps, and drugs may be secreted in cap visors, under postage stamps on letters, in cigars and various other ways. Constant vigilance is necessary if your jail is to be kept safe.

·  ·  ·  ·  ·

"Cells should be systematically searched for materials which would serve as a weapon or medium of self-destruction or escape. Razor blades are small and easily concealed.

·  ·  ·  ·  ·

"The law requires that visitors be carefully supervised to prevent passing in of weapons, tools, drugs, liquor and other contraband.

·  ·  ·  ·  ·

"In jails where a visitors' booth is provided, the safe-keeping of prisoners, especially those held for serious crimes, will be best insured if the booths are used for visits. Where there are no booths, and where prisoners are permitted to receive visitors in the corridors or jailer's office, visits should be closely supervised. Experience has shown that laxity in supervising visitors and searching packages has resulted in escapes, assaults on officers and serious breaches of discipline."

[15] Cf. *Lanza* v. *N. Y. S. Joint Legis. Comm.*, 3 N. Y. 2d 92, 164 N. Y. S. 2d 9, 143 N. E. 2d 772, affirming 3 App. Div. 2d 531, 162 N. Y. S. 2d 467; *Matter of Reuter*, 4 App. Div. 2d 252, 164 N. Y. S. 2d 534; see *Coplon* v. *United States*, 89 U. S. App. D. C. 103, 191 F. 2d 749.

[16] See *Jones* v. *United States*, 362 U. S. 257.

the petitioner's argument would still carry far beyond any decision which this Court has yet rendered. The case before us bears no resemblance to such cases as *Leyra* v. *Denno,* 347 U. S. 556, where a State attempted to use as evidence in a criminal trial a confession which had been elicited by trickery from the defendant while he was in jail. See also *Spano* v. *New York,* 360 U. S. 315. We do not have here the introduction into a state criminal trial of evidence which is claimed to have been unconstitutionally seized, as in *Mapp* v. *Ohio,* 367 U. S. 643. See *Rochin* v. *California,* 342 U. S. 165. Nor is this a case where it is claimed that the evidence actually offered at a trial was procured through knowledge gained from what had been unlawfully obtained—the "fruit of the poisonous tree." Cf. *Nardone* v. *United States,* 308 U. S. 338.

Here no such evidence was ever introduced in a prosecution against the petitioner. Rather, the petitioner was convicted for willfully refusing to answer the pertinent questions of a duly constituted legislative committee in the conduct of an authorized legislative investigation, after having been given immunity from prosecution. To hold that the petitioner could not constitutionally be convicted for refusing to answer such questions simply because they related to a conversation which had been unlawfully overheard by other state officials would thus be a completely unprecedented step.

The ultimate disposition of this case, however, does not demand consideration of whether such a step might ever be constitutionally required. For even if all the other doubtful issues should be resolved in the petitioner's favor, the record conclusively shows that at least two of the questions which the committee asked him were not related in any way to the intercepted conversation. The petitioner was asked to whom he had talked in February,

1957, about releasing his brother on parole.[17] He was asked to describe the efforts he had made to assist in obtaining his brother's release.[18] Not only is it apparent on their face that these questions were not dependent upon the conversation overheard at the jail, but committee counsel unequivocally so testified at the petitioner's trial.[19] *Costello* v. *United States,* 365 U. S. 265, 279–280. Refusal to answer either of these questions fully supports the judgment as modified by the New York courts.[20] *Whitfield* v. *Ohio,* 297 U. S. 431, 438.

Moreover, the record contains no basis for supposing that the committee would not have called the petitioner to testify, had it not been in possession of a transcript of the recorded jail conversation—assuming, *arguendo,* that such an attenuated connection would help the petitioner's case. See *Costello* v. *United States, supra.* Indeed, it is reasonable to infer that the petitioner would have been interrogated even if the transcript of the conversation had not existed. The committee knew of the suspicious circumstances surrounding the release of the petitioner's brother.[21] The committee knew that the petitioner had been one of the three visitors the brother had had during

---

[17] "Mr. Lanza, please tell the committee the name of anybody with whom you spoke during the month of February 1957 about the restoration to parole of your brother Joseph Lanza."

[18] "On February 5, 1957, your brother Joseph Lanza was arrested and returned to prison charged with a violation of parole. Tell the committee, please, any and all efforts extended by you to assist in obtaining the release of your brother Joseph Lanza on parole or his restoration to parole."

[19] "Q. You say that you did not gather any material from the tapes upon which to predicate that question, Mr. Bauman? A. I have said and I say, Mr. Direnzo, that that question as well as the previous one was not based upon any material in the tapes.

"Q. You are sure about that? A. Yes."

[20] See note 5.

[21] See note 1.

his stay in jail.[22] And the record shows that the committee had other independent information which could have occasioned the petitioner's interrogation. In short, we conclude that the ultimate constitutional claim asserted in this case, whatever its merits, is simply not tendered by this record.

*Affirmed.*

MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, concurring.

I do not understand anything in the Court's opinion to suggest either that the Fourteenth Amendment "incorporates" the provisions of the Fourth, or that the "liberty" assured by the Fourteenth Amendment is, with respect to "privacy," necessarily coextensive with the protections afforded by the Fourth. On that premise, I join the Court's opinion.

Memorandum opinion of MR. CHIEF JUSTICE WARREN.

I agree with MR. JUSTICE BRENNAN that the decision of the New York courts comes to us resting firmly upon an independent state ground and I therefore join his memorandum opinion. However, because the opinion of the Court departs from our practice of refusing to reach constitutional questions not necessary for decision, I deem it appropriate to add a few words.

Unquestionably, all that the Court's opinion decides is that since two of the questions asked petitioner by

---

[22] The others were the brother's wife and his lawyer.

148

the Committee were not in any way related to the intercepted conversation, the refusal to answer those questions alone "fully supports the judgment as modified by the New York courts." *Ante*, p. 146. Despite the fact that this holding deprives the Court of jurisdiction to intimate views on the other, more serious problems of *constitutional* dimension presented by the record, *Herb* v. *Pitcairn*, 324 U. S. 117; *Enterprise Irrigation District* v. *Farmers Mutual Canal Co.*, 243 U. S. 157; *Murdock* v. *Memphis*, 20 Wall. 590, and would warrant dismissing the writ as improvidently granted, *Benz* v. *New York State Thruway Authority*, 369 U. S. 147; *Atchley* v. *California*, 366 U. S. 207, the opinion undertakes, as MR. JUSTICE BRENNAN characterizes it, a "gratuitous exposition" upon those more difficult constitutional problems originally thought presented for decision. These expressions of dicta are in a form which can only lead to misunderstanding and confusion in future cases. Such dicta, when written into our decisions, have an unfortunate way of turning up in digests and decisions of lower courts; they are often quoted as evidencing the considered opinion of this Court, and this is so even though such intention is denied by the writer.

I am expressing my views separately because I believe that for several reasons it is particularly regrettable for the Court to depart from its normal practice in this case. The New York Court of Appeals, the highest court of the State, split 4–3 on the result reached below. And, because that court did not write a full opinion in announcing its decision, we cannot tell whether it intended to decide the constitutional issues or whether it even considered them. Its remittitur is unconvincing in determining whether its judgment was intended to rest on an independent state ground. See *Benz* v. *New York State Thruway Authority*, *supra*. What makes this Court's action singularly unfortunate is that the state courts, state offi-

cials and the people of New York State, have uniformly condemned the eavesdropping in this case as deplorable. The New York Appellate Division termed the action at the jail "reprehensible and offensive," *People* v. *Lanza*, 10 App. Div. 2d 315, 318, 199 N. Y. S. 2d 598, 601; earlier the court had called it "atrocious and inexcusable," *Lanza* v. *New York State Joint Legislative Committee*, 3 App. Div. 2d 531, 533, 162 N. Y. S. 2d 467, 470; also "flagrant and unprecedented," *Matter of Reuter*, 4 App. Div. 2d 252, 255, 164 N. Y. S. 2d 534, 538. In the Court of Appeals it was characterized as a "gross wrong," *Lanza* v. *New York State Joint Legislative Committee*, 3 N. Y. 2d 92, 101, 164 N. Y. S. 2d 9, 16, 143 N. E. 2d 772, 777 (dissenting opinion), and counsel for the Joint Committee made no effort to justify or excuse the action, but on the contrary himself called it "repulsive and repugnant," *ibid.* The Governor of New York termed unchecked eavesdropping "unwholesome and dangerous," McKinney's 1958 Session Laws of New York, 1837; and the Chairman of the New York Joint Legislative Committee on Privacy of Communications called the incident "deplorable" and reported that it had "brought forth a storm of protest from lawyers, some of whom had not previously been audibly concerned [with] . . . efforts to protect the people's right of privacy." Report of the New York Joint Legislative Committee on Privacy of Communications, Legislative Document (1958) No. 9, 25. It has been reported that a New York trial court judge found it necessary to release a prisoner without bail so that he would be able to consult his attorney, the judge not being able to feel confident after this incident that there was any jail in the State where the prisoner and his lawyers could be secure against electronic eavesdropping. Comment, 27 Fordham L. Rev. 390, 394, n. 35. The most striking indication of the degree to which the people of the State of New York were shocked by the

incident was the enactment of Article 73 of the Penal Law of New York, making it a *felony* to do what the officials in this case did. And finally the Appellate Division of the Supreme Court, affirmed by the New York Court of Appeals, reduced the bizarre and unprecedented sentence of ten years for contempt of court to one year.

It seems to me that when this Court puts its imprimatur upon conduct so universally reproached by every branch of the government of the State in which the case arose, we invite official lawlessness which, in the long run, can be far more harmful to our society than individual contumacy.

MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN concur in this opinion.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS join.

I must protest the Court's gratuitous exposition of several grave constitutional issues confessedly not before us for decision in this case. The tenor of the Court's wholly unnecessary comments is sufficiently ominous to justify the strongest emphasis that of the abbreviated Court of seven who participate in the decision, fewer than five will even intimate views that the constitutional protections against invasion of privacy do not operate for the benefit of persons—whether inmates or visitors—inside a jail, or that the petitioner lacks standing to challenge secret electronic interception of his conversations because he has not a sufficient possessory interest in the premises, or that the Fourth Amendment cannot be applied to protect against testimonial compulsion imposed solely as a result of an unconstitutional search or seizure.

The petitioner was convicted on several counts for failure to answer each of a number of questions put to him by

a state legislative committee. On appeal, the judgment, which had imposed 10 identical sentences to run consecutively, was modified by the Appellate Division to provide that the sentences on each count should run concurrently. The record shows, affirmatively and without rebuttal, that at least two of the questions were conceived and propounded independently of the search and seizure which the petitioner claims infringed his constitutional rights; and there is nothing which supports his contention that he would not have been questioned at all but for that claimed infringement.

Under these circumstances, it is apparent that the judgment of the Court of Appeals of New York can be adequately supported by an independent ground of state law. It is the settled law of that court that there is no occasion to review a conviction on one count of an indictment or information if the judgment and sentence are sufficiently sustained by another count.[1] Since this Court is thus able to see that the judgment of the court below—which is unelucidated by any opinion—is maintainable on an

---

[1] See *People* v. *Faden,* 271 N. Y. 435, 3 N. E. 2d 584; *People* v. *Cummins,* 209 N. Y. 283, 103 N. E. 169; *Hope* v. *People,* 83 N. Y. 418; *People* v. *Davis,* 56 N. Y. 95. That is also the federal rule, see *Hirabayashi* v. *United States,* 320 U. S. 81, 85.

In affirming the conviction, the Appellate Division found it unnecessary to pass on the petitioner's contention that he could be convicted of only a single crime because, the judgment having been modified to cause the sentences to run concurrently, "the conviction on any one count is sufficient to sustain the sentence . . . . (*People* v. *Faden,* 271 N. Y. 435, 444-445.)" 10 App. Div. 2d 315, 319, 199 N. Y. S. 2d 598, 603. The Court of Appeals, which in affirming without opinion modified the judgment to make clear that only a single crime had been committed, found no occasion to re-examine the sentence because "It is clear . . . that the number of crimes of which the defendant was found guilty did not enter into the duration of the sentence imposed." 9 N. Y. 2d 895, 897, 175 N. E. 2d 833.

adequate, independent state ground, it should forbear from any further review of the case; for, in light of the clearly established New York law, a decision by this Court on the federal questions sought to be tendered here would be but an exercise in futility.[2]   In any event, historic principles demand that any consideration of constitutional issues at least abide a clarification from the court below as to the basis for its judgment, in order "that this Court not indulge in needless dissertations on constitutional law."   *Minnesota* v. *National Tea Co.*, 309 U. S. 551, 557.

I do not mean, however, that I would seek clarification in this case.   It taxes credulity to suppose that the court below would disagree with the majority here that two of the counts are free of any taint, or depart from its own settled doctrine that even one such count requires affirmance.   And even if this Court were somehow free to disregard the law of New York, the Court has in the past limited its review of a state conviction in accordance with "the rule, frequently stated by this court, that a judgment upon an indictment containing several counts, with a verdict of guilty upon each, will be sustained if any count is good, and sufficient in itself to support the judgment."   *Whitfield* v. *Ohio*, 297 U. S. 431, 438.

While the Court does ultimately rest its disposition of the case on this ground, it does so by way of affirmance.

---

[2] Compare *Bachtel* v. *Wilson*, 204 U. S. 36, in which the Court dismissed a writ of error to the Supreme Court of Ohio, which had written no opinion.   The Court said, at p. 40: "Before we can pronounce [the judgment of the court below] in conflict with the Federal Constitution it must be made to appear that its decision was one necessarily in conflict therewith and not that possibly, or even probably, it was. . . .   We do not decide [that the state statute is to be given a construction which would render it constitutional], but we do hold that in view of the silence of the Supreme Court we are not justified in assuming that it [did not so construe the statute]."

It is at least arguable that the proper disposition is to dismiss the case because certiorari was improvidently granted. *Benz* v. *New York State Thruway Authority*, 369 U. S. 147;[3] *Fox Film Corp.* v. *Muller*, 296 U. S. 207. But in no event is it arguable that any of the constitutional questions the Court reaches are before it.

---

[3] In *Benz*, as here, the Court of Appeals had granted the petitioner an amended remittitur reciting that it had necessarily passed upon a federal constitutional question, to wit: "Whether plaintiff was deprived of just compensation in violation of the due process clause of the Fourteenth Amendment." Notwithstanding that representation, we concluded that the Court of Appeals had "decided no more than" a question relating to state court jurisdiction. That action was entirely consistent with *Honeyman* v. *Hanan*, 300 U. S. 14, 18–19: "A certificate or statement by the state court that a federal question has been presented to it and necessarily passed upon is not controlling. While such a certificate or statement may aid this Court in the examination of the record, it cannot avail to foreclose the inquiry which it is our duty to make or to import into the record a federal question which otherwise the record wholly fails to present." Indeed, as *Honeyman* v. *Hanan, supra*, and *Honeyman* v. *Hanan*, 302 U. S. 375, illustrate, proper pursuit of the matter when suspicions are aroused may disclose that a state court's certificate simply did not mean what it appeared, at first glance, to say.

The remittitur in this case recited: "Defendant argued that the imposition of penal sanctions for his refusal to answer certain questions deprived him of liberty without due process of law in violation of the Fourteenth Amendment. The Court of Appeals held that defendant's constitutional rights were not violated." The Court of Appeals wrote no opinion, and it is understood in New York that "affirmance without opinion is merely an adoption of the result reached by the Appellate Division, the reasoning of which is not necessarily adopted." Carmody's New York Practice (7th ed. 1956) 678. See *Commissioner* v. *Jackson*, 265 N. Y. 440, 441, 193 N. E. 262; *Soderman* v. *Stone Bar Associates, Inc.*, 208 Misc. 864, 867, 146 N. Y. S. 2d 233, 236. For all we can tell, the Court of Appeals concluded that the petitioner's "constitutional rights were not violated" by reasoning that the two untainted questions supported the conviction.