UNITED STATES of America,

v.

**Frances KAHN, Vincent Pacelli and Israel Schawartzberg, Defendants.**

United States District Court
S. D. New York.
Feb. 21, 1966.

Robert M. Morgenthau, U. S. Atty., for the Government, Howard L. Jacobs, John S. Martin, Jr., New York City, of counsel.

O. John Rogge, New York City, for defendant Frances Kahn.

Israel Schawartzberg, pro se.

Robert Kasanof, and Albert Krieger, New York City, for defendant Vincent Pacelli.

McLEAN, District Judge.

Defendants have been indicted for endeavoring to influence a government witness and for obstructing the due administration of justice, in violation of 18 U.S.C. § 1503, and for conspiracy to do so, and to suborn perjury, in violation of 18 U.S.C. § 371. Defendants now move, pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, to suppress certain recordings of conversations between defendant Kahn and the witness, Charles Hedges, and "all evidence pertinent thereto." I held a hearing and took testimony on this motion. The facts developed at this hearing are as follows:

In January 1961, Hedges was indicted in the United States District Court for the District of Connecticut for violation of the narcotics laws. He was tried from February 15 to March 21, 1961. He was convicted and sentenced to imprisonment for fifteen years and to pay a fine of $10,000. Defendant Kahn, an attorney, represented Hedges in that trial.

The District Court in Connecticut fixed Hedges' bail pending appeal in the sum of $50,000. He was unable to make that bail and consequently he was imprisoned in the Federal Penitentiary in Lewisburg, Pa. In late June 1962 he was transferred from Lewisburg to the Federal House of Detention on West Street, New York City. At that time he informed the United States Attorney of this district that he desired to "cooperate" with the government. Just what form this "cooperation" took and what information he gave to the United States Attorney at that time was not brought out at the hearing.

In July 1962 Hedges was transferred from West Street to the Westchester County Jail in Valhalla, New York, a New York State penal institution. He was there as a federal prisoner pursuant to some arrangement between the federal and the state authorities. He remained there approximately one month. In July 1962 defendant Kahn, as Hedges' attorney and at his request, moved for a reduction of bail. The District Court in Connecticut reduced it to $25,000. Hedges posted that bail and was thereupon released from prison in August 1962.

On December 11, 1962, Hedges was involved in a shooting incident, the details of which were not explained. Apparently he exchanged shots with somebody and as a result of this gunplay, he was wounded. He was sent for treatment to Kings County Hospital for a time and in January 1963, after he had recovered from his wound, he was sent back to Westchester County Jail. A state charge of violation of the Sullivan law was filed against him. This charge has never been disposed of.

Hedges took an appeal from his narcotics conviction. Defendant Kahn prosecuted the appeal as his attorney. The Court of Appeals affirmed his conviction in March 1963.

He did not apply for certiorari. Instead he applied to the District Court in Connecticut for a reduction of sentence. Defendant Kahn made this motion on his behalf. In May 1963, the District Court in Connecticut reduced his sentence from

fifteen to five years. Hedges served the remainder of this sentence in the Westchester County Jail. He was released in May 1965.

Defendant Kahn visited Hedges frequently at the Westchester County Jail. The record shows that she made 37 visits to him there between January 1963 and May 1965. At least eleven of these visits were made in the year 1964. The visitors' slips and other records maintained by the prison authorities with respect to visitors, describe defendant Kahn as Hedges' "attorney."

The interviews between defendant Kahn and Hedges usually took place in the sheriff's office. This was the customary place for interviews between prisoners and female attorneys who, according to the deputy warden, are not allowed to go "back on the floor."

On September 20, 1963, a judge of the County Court, Westchester County, made an order, pursuant to the New York statute (Code of Criminal Procedure, § 813–a) upon the application of the Acting District Attorney of Westchester County, authorizing the Acting District Attorney "or his duly authorized agents," to eavesdrop upon the personal conversations of Charles Hedges and to "install such electronic equipment as may be necessary to assure the eavesdropping, overhearing and recording of the said conversations." The order provided that it should be effective until November 20, 1963. As far as appears, no subsequent order was obtained.

Also on September 20, 1963, Hedges made an affidavit in which he swore that defendant Kahn had made certain statements to him, including a statement that defendant Pacelli had said that he would take care of all the expenses of Hedges' family and that he would see that Hedges had nothing to worry about if Hedges did not testify. Hedges further said in his affidavit:

"That I wish to cooperate with the Federal authorities to assist them in obtaining evidence against the suspects in this case. I make this offer for that purpose and consent that any and all future conversations between myself and Mrs. Kahn may be intercepted and put to use by the Federal Government for whatever purpose it deems fit."

This affidavit was delivered to the Acting District Attorney of Westchester County but it was not made part of the application for the eavesdropping order.

In October 1963, a federal narcotics agent installed electronic eavesdropping equipment in the Westchester County Jail. He concealed a transmitter under a desk in the sheriff's office and a receiver, together with recording equipment, in a nearby room. A similar transmitter was given to Hedges, who affixed it to his person. An interview took place between defendant Kahn and Hedges in the sheriff's office on October 6, 1963. Federal agents eavesdropped upon this conversation by use of the electronic equipment and made a record of it.* The eavesdropping equipment was removed by the federal agents at the end of the day on October 6.

In September 1964, federal agents again installed eavesdropping equipment in the sheriff's office. Two conversations between defendant Kahn and Hedges were overheard and recorded by federal agents, one on September 27, 1964, and the other on October 13, 1964. Shortly thereafter the equipment was removed.

The federal agent in charge of this investigation testified that federal officers did no eavesdropping on conversations between defendant Kahn and Hedges in the sheriff's office except on the four occasions when recordings were made.

In December 1963 a state officer, a deputy sheriff, installed electronic eavesdropping equipment in another room in

---

* Apparently shortly prior to October 6, 1963, an effort was made by federal agents to overhear and record a conversation between defendant Kahn and Hedges on this equipment. Because of mechanical difficulties, the record "did not come out." It was completely unintelligible.

the jail, the assistant warden's office. Apparently this was done on the expectation that conversations between defendant Kahn and Hedges would take place in that room. However, these expectations were not fulfilled. The deputy sheriff listened in on this equipment some five or six times in December 1963. On some of these occasions a federal officer also listened with him. They heard no conversations between defendant Kahn and Hedges. Apparently defendant Kahn and Hedges were not even there. No recordings were made because there was nothing to record. These activities are therefore irrelevant to this motion.

The government has produced the four recordings made by federal agents as heretofore described. I permitted attorneys for all defendants and also defendant Kahn and defendant Schawartzberg (who at his own insistence has no attorney in this action) to hear these recordings. I have listened to them as well. The government has represented to this court that it has produced all recordings of conversations between defendant Kahn and Hedges in its possession or of which it has knowledge. I rely upon that representation. I find that there was no eavesdropping upon the electronic equipment installed by federal agents except that which was recorded upon the four records which have been produced. We are concerned on this motion, therefore, only with those four records.

The records are largely unintelligible because of the interference of "background noises." Some words can be caught here and there. Although invited by the court to do so, the government has not stated what use it proposes to make of these records at the forthcoming trial. It takes the position that that question is irrelevant on the present motion. In this, I believe that the government is correct. The question now before me is not what the recordings prove, if anything, but whether they should be suppressed completely on the ground that the eavesdropping and the recording infringed defendants' constitutional rights.

Before turning to that subject, I note the explanation for the mechanical difficulties in the recording. The background noise was made by a transistor radio. Defendant Kahn testified that she brought this radio with her and played it during her interviews with Hedges because it was "notorious" that eavesdropping went on at the Westchester County Jail. The fact that recordings were made of her conversations obviously came as no surprise to her.

Considerable testimony and argument have been devoted to the question of whether, at the time the conversations were recorded, the relationship of attorney and client existed between defendant Kahn and Hedges. There is no doubt that that relationship existed at least until May 1963. There is evidence that thereafter Hedges sought and obtained defendant Kahn's legal advice about the Sullivan Law charge and about an application which Hedges was considering, but which, as it turned out, he never made, for an order of this court directing that he be returned to Lewisburg. Hedges testified that although he did not regard defendant Kahn as his attorney after his conviction was affirmed and his sentence was reduced, he never told her so. He did not retain any other attorney. As previously noted, the prison authorities treated defendant Kahn as Hedges' attorney throughout. Defendant Kahn could reasonably have believed that she continued to be his attorney, even after her active services with respect to the criminal prosecution were concluded.

For the purposes of this motion, I shall assume that the attorney-client relationship existed at the relevant times, i. e., October 1963 and September and October 1964. I shall consider the constitutional question raised by this motion in the light of that assumption.

Defendants have asserted rights under a variety of constitutional provisions. The New York Civil Liberties Union has also mentioned several in a brief filed amicus curiae in support of the motion. Between them, defendants and the amicus curiae claim that the eavesdropping and

recording violated no less than six different amendments, i. e., the First, Fourth, Fifth, Sixth, Ninth and Fourteenth. Some of these contentions are clearly without merit.

Since we are here concerned with evidence obtained by federal officers for use in a federal criminal prosecution, the Fourteenth Amendment obviously has no application. The right of a defendant in a criminal prosecution "to have the Assistance of Counsel for his defense," guaranteed by the Sixth Amendment, is not involved. This case is not like Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) where the eavesdropping of defendant's conversations occurred after defendant had been indicted and had retained counsel.

The First and Ninth Amendments, in my opinion, have at most only a tangential bearing upon the case. In Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), relied upon by defendants here, a state statute which forbade the use of contraceptives was held to violate the Fourteenth Amendment. The Court discussed "the right of privacy" enjoyed by married couples. In the course of its opinion it mentioned the First Amendment and said of it that it "has a penumbra where privacy is protected from governmental intrusion." · (381 U.S. at 483, 85 S.Ct. at 1681) The Court also quoted the Ninth Amendment which provides:

"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

The Court implied that the "right of privacy" is one of these rights retained by the people.

To my mind, it is not necessary to strain the language of the First or Ninth Amendments in order to raise the problem presented in this case. It is squarely raised by the Fourth Amendment which provides that:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *."

So much of the Fifth Amendment as provides that no person "shall be compelled in any criminal case to be a witness against himself" is also involved, in the sense that where unreasonable search and seizure is concerned, "the Fourth and Fifth Amendments run almost into each other." Boyd v. United States, 116 U.S. 616 at 630, 6 S.Ct. 524 at 532, 29 L. Ed. 746 (1886) cited in Lopez v. United States, 373 U.S. 427 at 455–456, 83 S.Ct. 1381 at 1396–1397, 10 L.Ed.2d 462 (1963) (dissenting opinion). Philosophically speaking, obtaining evidence from a defendant by an unreasonable search and seizure may be said to violate his privilege against self-incrimination, i. e., his right to protect and retain the incriminating evidence which was unreasonably seized. But the fundamental question still is: Was the search and seizure unreasonable?

In considering the authorities which bear upon this question, a proper starting point is On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). In that case a government undercover agent who was a friend of defendant, engaged defendant in conversation in defendant's place of business, which was also his home. The agent was "wired for sound," i. e., he had an electronic transmitter concealed upon his person. Defendant made incriminating admissions in the course of the conversation. They were transmitted by the electronic device to another government agent who was stationed outside the building with a receiving apparatus. This latter agent testified at the trial to the conversations. Defendant's conviction was affirmed. The Court held that there was no unreasonable search and seizure.

In recent years the attitude of the Supreme Court has changed markedly from that expressed in *On Lee,* where the Court said (343 U.S. at 754, 72 S.Ct. at 972):

"It would be a dubious service to the genuine liberties ˙protected by

the Fourth Amendment to make them bedfellows with spurious liberties improvised by farfetched analogies which would liken eavesdropping on a conversation, with the connivance of one of the parties, to an unreasonable search or seizure."

The question has arisen as to whether *On Lee* is still good law. Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) bears directly on that question. There an Internal Revenue agent, also wired for sound, made a recording by an electronic recording device of conversations which he had had with defendant in the latter's place of business. The Court held that the Fourth Amendment was not violated and that the record was properly admitted. The Court cited *On Lee*. Three justices dissented. The Chief Justice, while concurring with the majority in the result, agreed with the dissenters that *On Lee* was wrongly decided.

■ No case has been cited to me, and I have found none, which has expressly overruled *On Lee*. I have no doubt that the views of what thus far is a minority of the Supreme Court would condemn the eavesdropping that occurred in this case. But it is the duty of a district judge to follow majority opinions, not dissenting ones. If the law is to be changed, the Supreme Court, not the district court, must change it. If the law as it now stands sanctions what was done here, this court must apply and enforce that law.

There are certain points of difference between *On Lee* and *Lopez* and the present case. The question is whether these differences permit or require a different result. If they do not, then *On Lee* and *Lopez* require a denial of the present motion.

The first point of difference is that in *On Lee* and *Lopez*, the eavesdropping occurred in defendant's home or place of business. Here it occurred in a jail. This difference weighs in favor of the government. In Lanza v. State of New York, 370 U.S. 139, 82 S.Ct. 1218, 8 L. Ed.2d 384 (1962), the Supreme Court said, in what concededly was a dictum, that:

"* * * it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day." (370 U. S. at 143, 82 S.Ct. at 1221)

■ This amounts to saying that a jail is not a constitutionally protected area. Neither counsel nor I have been able to find any other authority on this point. I feel obliged to follow this pronouncement of the Supreme Court, even though it is a dictum.

■ Moreover, I agree with it. I do not accept defendants' argument that the sheriff's office was really defendant Kahn's law office, pro tem. It was a room in a jail, which she was permitted to use at the sufferance of the prison authorities.

This also disposes of the second factual difference. In *On Lee* and *Lopez*, the person carrying the listening device gained entrance to defendant's home or place of business with defendant's consent and without trespass. Here defendant Kahn did not consent. If federal officers, without her knowledge, had surreptitiously entered her home or office and had therein concealed an electronic transmitter, this would have been a trespass which, under the rule of the "spike mike" cases, would doubtless have invalidated the search. Cf. Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961).

■ But since the sheriff's office in a jail is not defendant Kahn's home or office, there was no trespass when federal officers, with the consent of the prison authorities, installed a listening device in it.

The third difference is that in neither *On Lee* nor *Lopez* was there any attorney-client relationship between the parties. In *Lanza*, again by way of dictum, the Court said:

"Though it may be assumed that even in a jail, or perhaps especially

there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection, there is no claimed violation of any such special relationship here." (370 U.S. at 143–144, 82 S.Ct. at 1221)

Just what the Court meant by this is not entirely clear. It may be noted, however, that in *Lanza*, the eavesdropping was carried on by third persons without the knowledge of either participant in the conversation. Here one participant, Hedges, the client, was fully aware of it and indeed actively facilitated it. Moreover, for whatever it may be worth, it is apparent that the other participant, defendant Kahn, the attorney, suspected it and took precautions to frustrate it by the use of her radio. Under these circumstances, the mere fact that the conversations were between an attorney and her client does not render unreasonable what would otherwise be a reasonable search and seizure. Benson v. People of State of California, 336 F.2d 791 (9th Cir.1964), cert. denied, 380 U.S. 951, 85 S.Ct. 1086, 13 L.Ed.2d 970 (1965).

■ The principle is well settled that the attorney-client privilege is for the protection of the client. The privilege is his, not the attorney's. Hunt v. Blackburn, 128 U.S. 464, 9 S.Ct. 125, 32 L.Ed. 488 (1888); Wild v. Payson, 7 F.R.D. 495, 500 (S.D.N.Y.1946); 8 Wigmore, Evidence (McNaughton Rev. 1961) § 2321 at 629.

■ Here the client's privilege was not violated. There was no attempt to eavesdrop upon a client while he was disclosing confidential information to his attorney. The whole purpose of the eavesdropping, on the contrary, was to secure, with the active collaboration of the client, evidence of the commission of a crime by the attorney, i. e., the offering of a bribe to a prospective witness, a crime which the government had probable cause to believe would be committed by the attorney. An attorney has no privilege to attempt to bribe his client. The existence of an attorney-client relationship between the parties to these conversations, therefore, on the facts disclosed by the evidence here, is not a factor which distinguishes this case from *On Lee* or which requires a result on the constitutional question different from that reached in *On Lee*.

It is argued that there is a fourth difference between *On Lee* and *Lopez* and the present case. In *On Lee* and *Lopez*, the eavesdropping did not, as far as appears, violate state law. Defendants claim that here it did. They point to Sections 738 and 739 of the New York Penal Law, McKinney's Consol.Laws, c. 40, and to Section 813–a of the New York Code of Criminal Procedure.

Section 738(2) provides that a person "not present during a conversation or discussion who wilfully and by means of instrument overhears or records such conversation or discussion * * * without the consent of a party to such conversation or discussion" shall be guilty of a felony.

Section 739 provides that eavesdropping pursuant to an ex parte order granted pursuant to Section 813–a of the Code of Criminal Procedure, shall be exempt from the provisions of Section 738.

It is true that as far as the evidence discloses, there was no state court order which authorized anyone to eavesdrop on the conversations in September and October 1964. Moreover, the order of September 20, 1963, issued under Section 813–a, did not purport to authorize federal officers to eavesdrop, unless the federal officers may be said to be the "duly authorized agents" of the Acting District Attorney of Westchester County, who was the person empowered by the order to eavesdrop at that time.

■ The short answer to defendants' contentions is that there was no eavesdropping here at all, within the meaning of Section 738 of the Penal Law, because one of the parties to the conversations consented. People v. Velella, 200 N.Y.S. 2d 966 (Gen.Sess. N.Y.Co.1960).

Furthermore, the Court of Appeals for the Second Circuit has held that, in a case in which, as far as one can tell from the opinion, neither party to the conver-

sation consented, "the New York statutes" (meaning apparently both the Penal Law and the Code of Criminal Procedure) do not apply to federal law enforcement officers. United States v. Pardo-Bolland, 348 F.2d 316 (2d Cir. 1965), cert. denied, 382 U.S. 944, 86 S. Ct. 388, 15 L.Ed.2d 353 (1965). See also United States v. Borgese, 235 F. Supp. 286 (S.D.N.Y.1964).

Hence, the federal officers did not violate New York law in this case.

█ I conclude, therefore, that defendants' constitutional rights have not been violated by the overhearing and recording of the conversations of defendant Kahn and Hedges. In view of this conclusion, it is unnecessary to consider whether or not it is only the defendant Kahn, the only defendant whose conversations were overheard, who, in any event, has any standing to complain.

In thus deciding the constitutional question in favor of the government, I express no opinion as to whether the records of these conversations have sufficient probative force to justify their admissibility. I will pass upon that question if and when they are offered.

Motion denied.

So ordered.