STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

18-60

STATE OF LOUISIANA

VERSUS

JEFFERY DWAYNE DUCOTE, SR.
A/K/A JEFFERY DWAYNE DUCOTE

************

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 329,700
HONORABLE MARY LAUVE DOGGETT DISTRICT JUDGE

************

SYLVIA R. COOKS
JUDGE
************

Court composed of Sylvia R. Cooks, John E. Conery, and D. Kent Savoie, Judges.

**AFFIRMED IN PART, REMANDED WITH INSTRUCTIONS.**

Holli Herrie-Castillo
Louisiana Appellate Project
P.O. Box 2333
Marrero, LA 70073
(504) 345-2801
Attorney for Appellant/Defendant
  Jefferey Dwayne Ducote, Sr. a/k/a Jeffery Dwayne Ducote

J. Phillip Terrell, Jr.
District Attorney, Rapides Parish
Catherine L. Davidson
Assistant District Attorney
Ninth Judicial District
P.O. Drawer 1472
Alexandria, LA 71309
(318) 473-6650
Attorneys for Appellee
  State of Louisiana

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

On a lazy Sunday afternoon, while AK[1] and her pet cat were enjoying the Christmas holiday weekend relaxing at home, preparing to visit her parents just down the road from her small rent house, there was a knock at the front door. AK had just gotten out of the shower, so she quickly dressed to answer the door. As is the habit of most people like AK in this small rural community she opened the door thinking the visitor was either family or a friend come to call during the holiday season. But as soon as AK realized the man at the door was a stranger to her (later identified as Jeffery Dwayne Ducote, Sr. a/k/a Jeffery Dwayne Ducote (Defendant)) she "closed it back a little bit" and spoke to him. He asked her if a man named Heath lived there and she responded "no." He asked her the same question again and she informed him she now lived in the house. He continued to converse with AK asking if she knew whether the owners of the house also owned the lot next door. She responded that she did not know anything about that property. Defendant turned away as though he were leaving; but, as AK was closing the door, Defendant pushed the door open and "put a gun in [her] face." AK fell to her knees and put her hands up in the air. Defendant forced AK to sit on the couch and asked if she had any money or anything of value in the house. She responded that she did not keep cash on her and the only things of value she had was her credit cards and bank card in her purse which she offered to give her assailant. Defendant then took AK throughout the house inspecting each room to determine if they were alone in the house. He

---

[1] Under the provisions of LA.R.S. 46:1844(W) the victim of a sex crime shall be entitled to confidential treatment in the courts and we therefore will refer to the victim in this case as AK. We have also avoided the use of other family members names in this opinion in an effort to safeguard the confidentiality accorded AK by law. A notation has been made on the record of these proceedings indicating the record is "**CONFIDENTIAL and is NOT OPEN FOR GENERAL INSPECTION.**"

warned her if he found anyone in the house he would kill them and kill her for lying to him.

After searching every room in the house, the two returned to the living room. While holding AK at gunpoint Defendant pulled down his pants, "put his hand on the back of [her] head," and physically forced AK to perform oral sex on him. Defendant next demanded AK take off her clothing as she pleaded with him not to hurt her. He then turned AK around and attempted to have intercourse with her from behind, but he was unable to achieve penetration because he could not sustain an erection. With his gun in hand he then forced AK into her bedroom, made her lay down on her bed, and then got on top of her. Defendant again pulled down his pants and forced AK to insert his penis vaginally. As Defendant kissed, fondled and raped AK he saw her eyeing his gun and told her not to even think about trying to get his gun. Following this second rape Defendant asked AK if she had anything in the house to drink. He took her into the kitchen to see what she could find for him to drink. She did not have any beer as he requested, but she had an open bottle of wine in the refrigerator and an open container of milk. Defendant drank the wine and insisted AK also drink some of the wine with him after which he again forced AK to perform oral sex on him. He continued to hold onto his gun at this point. After forcing this episode of oral sex, Defendant next made AK stand up, bend over, hold onto the refrigerator and, once again, unsuccessfully tried to penetrate her vaginally. When this effort failed to achieve an erection, Defendant made AK turn around facing him, squat down and again perform oral sex on him. During this episode Defendant finally laid his gun down on the kitchen island. AK managed to stand up and seized the opportunity to grab the gun and head for the door. Defendant had his pants down around his ankles and AK was totally nude. He reached out to grab AK as she ran toward the door and tackled her to the floor. Defendant wrestled with AK trying to get his gun from her, but she would not relinquish the weapon. She

2

succeeded in escaping his grasp and as she ran from the house she tried to pull back on the hammer of the gun but could not get it to fire. AK tried to get in her car, but it was locked. Her keys were inside the house hanging on the wall. She headed for the neighboring house to get help, but no one was home. She recalled observing an SUV in her driveway which she was able to identify in court, along with other witnesses who observed the same SUV and identified it in court as belonging to Defendant. She turned to see Defendant fleeing from the house. AK jumped into a "big ditch" on the side of the road to hide from view fearing Defendant would try to run over her if he spotted her. She could see Defendant's SUV heading in the opposite direction. She crossed the street to a neighboring house, but no one was home. AK hid on the screened porch at the front of the house watching the traffic go by waiting for a vehicle to approach from the opposite direction. She did not have her contact lenses in so AK could not see well enough from the porch and feared Defendant would return looking for her. After a few minutes she left the porch and ran behind a tree hoping to flag down a passing motorist. When she saw a van approaching from the right direction she "ran out in the middle of the road," naked, still holding the gun. The vehicle stopped, the passenger put down her window but was afraid of AK. Realizing she was holding a gun AK placed it on the ground and told the couple she was raped. They would not allow her to get in their vehicle but instructed her to wait on the porch while they went for help. Just down the street the couple came upon a man outside his home. They told him about AK and asked him to get a blanket to cover her with. They called 911 and returned to help AK. The man instructed AK to place the gun on the steps and cover herself with the blanket he provided. AK gave him her dad's phone number and he called him to come at once. Shortly thereafter Sheriff's deputies arrived along with AK's mom, dad and aunt. She sat on the porch for a short time with her parents while deputies searched her residence and the immediate area. Deputies observed obvious

3

signs of a struggle inside AK's house. AK was placed in the patrol unit until an ambulance arrived and took her to the local hospital where she was photographed by a deputy and examined by a Sexual Assault Nurse. The photographs depicted various scratches, abrasions and dried blood on her body indicating she had been in a struggle as well as ant bites on her feet which occurred while she hid in the ditch.

Sheriff's detectives traced ownership of the gun used in the attack which led to the original owner who had traded the gun to another person. The day following the attack AK was shown a photo lineup of possible suspects and she identified a man she thought was the perpetrator. He was the individual identified as the man to whom the owner had traded the gun. The authorities took him into custody but quickly learned he might not be the man who attacked AK. He told detectives he too, had traded the gun for a shotgun to a man named Jeff. He did not know Jeff's last name but still had his cellular telephone number. Detective's traced the number to Defendant and learned he and his wife owned a Ford Expedition that matched the description of the vehicle at the scene of the crime. On the next day authorities set up a second photo lineup that included Defendant. AK made a definite ID of Defendant as the perpetrator. She again identified Defendant in court as the perpetrator without any doubt. Defendant's DNA, contained in fluid secreted from his prostate, was found on swabs taken from AK's body. DNA voluntarily obtained from the first man identified by AK did not match any found on AK's body.

Defendant was convicted by a unanimous jury verdict of four counts of first-degree rape, violations of La.R.S. 14:42, one count of second-degree kidnapping, a violation of La.R.S. 14:44.1, one count of false imprisonment with a weapon, a violation of La.R.S. 14:46.1, one count of aggravated assault with a firearm, a violation of La.R.S. 14:37.4, and one count of home invasion, a violation of La.R.S. 14:62.8. His motion for post-verdict judgment of acquittal and his motion for new trial were denied. Defendant waived delay for sentencing. The trial court sentenced

Defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence on all four counts of first-degree rape; forty years at hard labor with at least two years to be served without benefit of parole, probation or suspension of sentence for second-degree kidnapping; ten years at hard labor for false imprisonment with a weapon; and thirty years at hard labor for home invasion; all sentences to run concurrently.

Defendant appeals his convictions and sentences alleging two assignments of error: (1) the trial court erred in denying Defendant's motion in limine to exclude certain jailhouse phone calls to his wife containing incriminating statements; and (2) the trial court erred in imposing an indeterminate sentence on the charge of second-degree kidnapping.

## LEGAL ANALYSIS

We review all criminal appeals for errors patent on the face of the record. There are two such errors in this case which must be corrected, one of which is covered in Defendant's assignments of error. The court minutes incorrectly state the trial court imposed the sentence for second-degree kidnapping with two years to be served without benefit of probation, parole or suspension of sentence. The transcript indicates the court imposed the sentence with "at least" two years to be served without benefit of parole, probation or suspension of sentence. This court has repeatedly ruled that "when the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. It is therefore necessary that the trial court correct the sentencing minutes to accurately reflect the four sentences imposed.

Defendant correctly asserts the sentence imposed on the charge of second-degree kidnapping constitutes an indeterminate sentence. Louisiana Code of Criminal Procedure Article 879 requires the imposition of a determinate sentence.

5

The transcript, which we have said is controlling, reflects the trial court imposed the sentence stipulating that "at least two years" of the second-degree kidnapping sentence be served without benefits. This constitutes an indeterminate sentence which must be vacated, and the case must be remanded for resentencing on the conviction for second-degree kidnapping.

Defendant asserts the trial court erred in admitting jailhouse telephone calls between Defendant and his wife because they enjoy a spousal privilege making their conversations confidential. He maintains under La.Code Evid. art. 504(A) the communications between Defendant and his wife should remain confidential. He also asserts the trial court erroneously relied on *State. v. Dupuy*, 319 So.2d 294 (La.1975) and *State v. Lilly*, 12-08 (La.App. 1 Cir. 9/21/12), 111 So.3d 45, *writ denied*, 12-2277 (La. 5/31/13), 118 So.3d 386, in finding that spousal privilege does not apply here.

Louisiana Code of Evidence Article 504 states in pertinent part:

**A. Definition.** A communication is "confidential" if it is made privately and is not intended for further disclosure unless such disclosure is itself privileged.

**B. Confidential communications privilege.** Each spouse has a privilege during and after the marriage to refuse to disclose, and to prevent the other spouse from disclosing, confidential communications with the other spouse while they were husband and wife.

Defendant's wife testified they were fully informed and understood their telephone conversations were not made privately and could be further disclosed as they could be monitored and/or recorded for future reference.

In *Dupuy* the supreme court found no error occurred where the trial court admitted statements made by the defendant's wife into evidence when the wife testified, out of the jury's presence, that there were third parties present during the communications at issue, and the defendant did not call the third parties to the stand to refute these claims despite the third parties being listed as defense witnesses.

6

In *Lilly*, the first circuit found spousal privilege did not apply to jailhouse calls because the couple was put on notice that the phone calls were monitored and possibly recorded. The court stated, "Even if the defendant and his wife never intended for the conversations to be disclosed, the fact that they were aware that a third party could monitor or record their conversation destroyed the confidential nature of the communication." *Lilly*, 111 So.3d at 45.

According to Defendant, this court should not follow the finding of the first circuit in *Lilly* because: (1) as evidenced by the frequency with which it occurs, inmates still believe they have a reasonable expectation of privacy despite the warnings that their calls might be monitored or recorded; (2) a non-human machine recording a conversation between two people is not the same as having a conversation in the presence of a third party; and (3) to deem all monitored jailhouse calls as unprivileged communication between spouses would effectively eliminate marital privilege for accused individuals who cannot afford to make bond because he or she can never have a privileged conversation with his or her spouse once he is incarcerated. We find these assertions meritless.

Inmates and their spouses are warned prior to making a phone call that the call may be recorded or monitored. Defendant's wife admitted in her testimony she was informed and understood her telephone conversations with Defendant were subject to recording. There could be no expectation of privacy under such circumstance. The fact that many prisoners continue to make such calls to spouses and disclose incriminating information does not negate the fact that they are aware that such calls are not confidential when they are forewarned about possible monitoring or recording of the calls.

Defendant attempts to draw a distinction between two people having a conversation in the presence of a third party and two people having a conversation where a non-human machine records their conversation. This is a distinction without

a difference. This attempt fails because the recording captures the communication for later review by a third party. While a conversation in the presence of a third party may or may not be overheard by the outside party, as evidenced by *Dupuy*, the presence of the third party creates a prima facie showing that the communications were not privileged, and it is up to the defendant to rebut this. Here, where the jailhouse call was recorded and captured for monitoring by a third party, and the spouses were put on notice that the communications could be recorded, confidentiality and privilege are lost.

In *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, (1984), the United States Supreme Court addressed the question of a prisoner's right to privacy. In *Hudson* the right to privacy did not apply to searches of prisoners' cells. In reaching its decision that society's interest in the security of prisons outweighs a prisoner's expectation of privacy the court explained:

> Determining whether an expectation of privacy is "legitimate" or "reasonable" necessarily entails a balancing of interests. The two interests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell. The latter interest, of course, is already limited by the exigencies of the circumstances: *A prison "shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." Lanza v. New York*, 370 U.S. 139, 143–144, 82 S.Ct. 1218, 1220–1221, 8 L.Ed.2d 384 (1962). We strike the balance in favor of institutional security, which we have noted *is "central to all other corrections goals," Pell v. Procunier*, 417 U.S. [817] at 823, 94 S.Ct., [2800] at 2804 [1974]. *A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates* and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that *"[l]oss of freedom of choice and privacy are inherent incidents of confinement." Bell v. Wolfish*, 441 U.S. [520] at 537, 99 S.Ct. [1861], at 1873[1979].

*Hudson*, 468 U.S. 527–28 (emphasis added).

Likewise, in the context of a prisoner's expectation of privacy in spousal communications made via telephone calls from the jailhouse, subject to being

8

monitored and/or recorded, the prisoner's interest in confidential communication with his/her spouse must yield to the paramount interest of institutional security. In both instances, the search of a jail cell or monitoring of a phone call, the prisoner is forewarned that he does not enjoy the ordinary protections guaranteed in the non-custodial world. His cell may be randomly searched without probable cause and his phone conversation may be monitored and recorded to assure the safety and security of the penal institution in which he/she is confined. Defendant and his wife were both informed that their phone conversations were subject to monitoring/recording before any call was made. There is no rational basis to suggest that either spouse could have any expectation of privacy during these calls.

We also find no merit in, nor any jurisprudential support for, Defendant's third argument that this court's holding monitored jailhouse calls are unprivileged communications would eliminate the marital privilege for those accused individuals who cannot afford bond because they will no longer be able to have unmonitored communications with their spouse. Any private conversations between a defendant and a spouse that occurred prior to the defendant being jailed would still be protected by marital privilege. Moreover, the fact that these calls are monitored does not preclude discussions concerning bond.

For the reasons stated, we affirm Defendant's convictions. We hereby order this case remanded to the trial court for the express purpose of correcting the court minutes to reflect the same language used in the transcript regarding Defendant's sentence for his conviction of second-degree kidnapping. We further order this case remanded to the trial court for resentencing on the conviction for second-degree kidnapping and direct the trial court to impose a determinate sentence for this conviction as provided by law. In all other respects Defendant's convictions and sentences are affirmed.

**AFFIRMED IN PART, REMANDED WITH INSTRUCTIONS.**

9