**UNITED STATES of America, Plaintiff,**

v.

**Jose LOPEZ and Nicolas Santiago-Quintana, Defendants.**

**No. CR 79–484–RMT.**

United States District Court,
C. D. California,
Criminal Division.

Aug. 14, 1979.

Andrea Sheridan Ordin, U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief, Crim. Div., Nancy Wieben Stock, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Joseph Reichmann, Los Angeles, Cal., for defendant Lopez.

Milton Kerlan, Jr., Pasadena, Cal., for defendant Santiago-Quintana.

## OPINION

TAKASUGI, District Judge.

At the conclusion of an evidentiary hearing occasioned by defendants' motion to suppress certain specified evidence, this court granted the motion, finding that the conduct of the law enforcement officers surpassed the permissible boundaries envisioned by the search and seizure provisions of the fourth amendment, United States Constitution.

This court's reasoning necessitates a detailed recitation of the facts surrounding this case.

At approximately 1:00 a. m., two California Highway Patrol ("CHP") officers, from a distance of about a quarter mile, observed a tractor-trailer rig slowly climbing a steep grade. A late-model Datsun pickup with an attached camper unit was then seen overtaking the rig. As the pickup came upon the rig, the pickup began to jerk, finally stalling in its lane of travel on the public highway. The CHP officers decided to render assistance to the distressed vehicle. As the officers were approaching, they observed defendant Jose Lopez ("Lopez"), a passenger, exit the vehicle, walk around it and reenter on the driver's side, which was occupied by defendant Nicolas Santiago-Quintana ("Santiago") prior to and during the vehicle stall. No evidence was presented as to how Santiago moved from the driver's seat to the passenger seat or whether either defendant noticed or was aware of an approaching police vehicle. By the time the CHP officers reached the pickup and activated their overhead warning lights, Lopez had successfully restarted the pickup and had proceeded in its operation.

Although the peril facing the distressed vehicle had apparently subsided, one of the officers ordered Lopez to drive onto the shoulder portion of the highway. Following the vehicle stop, the officers asked for and received Lopez's valid California operator's license. The officers then proceeded to question him concerning the ownership of the pickup, but never asked him to produce any proof or questioned him as to where the vehicle registration might be located. Meanwhile, one of the officers began to run a computer "check" on Lopez and on the license number of the vehicle.[1]

When Lopez did not answer to the satisfaction of the questioning officer, and before the computer data was available,[2] that officer, without securing anyone's consent, entered the vehicle and searched the contents of the glove compartment. No registration card was found there. The officer then searched the dashboard and the visors, but failed to observe a car dealer's receipt of sale which was taped to the inside of the

---

1. The information eventually relayed to the officers included a valid arrest warrant for Lopez.

2. According to the officer's testimony, the computer information takes three to seven minutes to receive.

windshield just above the glove compartment.[3] He then spied a crumpled white Jack-in-the-Box restaurant bag partially under the seat. Testifying that the bag could have contained the registration card,[4] the officer opened it and discovered instead some $2700.00 in Mexican pesos and money orders. Perceiving that "crime was afoot," he continued his search and found a brown bag filled with additional cash.

Then, for reasons never articulated, the officer spread open a louvered shade covering the window to the camper and observed a number of people sitting in the back. He immediately advised his partner that the individuals in the back of the pickup were undocumented aliens. Sometime later, the officer reentered the cab portion and found a list of names, a so-called "pollo"[5] list, laying on the dash that had been folded and clipped with a pen. The defendants were then arrested and charged with transporting undocumented aliens. They claim that the search violated their fourth amendment rights, and that any evidence found as a result of the search and seizure should be suppressed.

## I.

■ Before reaching the merits of the controversy, a determination must be made that the defendants have properly asserted a violation of their individual rights in order to properly challenge the legality of the search. Under *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979), occupants of a vehicle are not granted an automatic right to object merely because they are present while a search, later found illegal, is being conducted. Rather, the inquiry focuses on each individual, because fourth amendment rights are personal rights which cannot be asserted vicariously. The question is "whether the challenged

search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it." *Id.* at 138, 99 S.Ct. at 429.

■ The opinion outlines three interests, one of which must be asserted in order to challenge illegal police procedures: The defendant must claim either a property or possessory interest in the automobile, or an interest in the property seized. *Id.* The propriety of allowing the driver who was also the owner of the searched vehicle to challenge the search was not questioned. Because the passengers could claim neither a property nor a possessory interest in the vehicle or its contents, the Court said that no violation of their individual rights had occurred and denied the motion to suppress.

While in the present case neither of the occupants owned the car, Santiago had been granted permission to use the vehicle and had exclusive control over its operation. This fact clearly distinguishes this case from *Rakas.* Santiago was not merely a guest of the owner of the vehicle, rather, he had exclusive control over the vehicle, dictating how the vehicle was to be used. Whether a nonowning driver has the requisite expectation of privacy was not squarely addressed in *Rakas,* and as Justice White noted in his dissenting opinion, the question remains unresolved. *Id.* at 167, 99 S.Ct. 421. It is this question that must now be confronted by this court.

In *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the petitioner established the requisite degree of interest in an apartment which was searched although he was neither its owner nor leasor. The court found that the fact that the owner of the apartment had given the petitioner permission to use the apartment and a key to it, combined with the fact that he had made exclusive use of the

---

**3.** Note that the receipt is valid proof of registration, and locating it would presumably have ended the search.

**4.** The officer conducting the search had 14 years of experience as a highway patrolman, five of which were spent as a special duty officer in the area of document inspection.

**5.** "Pollo" in the parlance of those smuggling Mexican aliens is a pejorative term literally meaning "chicken." It is meant in the sense that "coyotes," those smuggling the aliens, feed upon the "pollo."

apartment, having slept there "maybe a night," persuasive evidence of a sufficient interest. This reasoning was duly noted in *Rakas*:

> Jones not only had permission to use the apartment of his friend, but had a key to the apartment with which he admitted himself on the day of the search and kept possessions in the apartment. Except with respect to his friends, Jones had complete dominion and control over the apartment and could exclude others from it.

*Id.* at 149, 99 S.Ct. at 433. The *Jones* holding was approved in *Rakas,* which viewed the holding as standing for the "unremarkable proposition" that one can establish a sufficient interest in a place other than that person's home.

■ The *Jones* holding is equally applicable in the present case where defendant was given use of a vehicle rather than an apartment, bringing this court back to the question of whether Santiago had the requisite "legitimate expectation of privacy." This court holds that he does. Having been given permission to use the vehicle along with the keys to that vehicle, and having made use of the vehicle to a substantial degree, Santiago possesses the requisite interest to legitimately challenge the propriety of the search. This court reaches this conclusion through use of the principles laid down in *Jones, Rakas,* and *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). However, this court finds additional support in Justice Powell's concurring opinion in *Rakas.* Justice Powell, joined by Chief Justice Burger, noted that a proper distinction could be made in the fourth amendment rights between mere passengers and those individuals having exclusive control over the vehicle or its locked compartments. 439 U.S. at 154, 99 S.Ct. 421. He later stated that "[n]one of the passengers is said to have had control of the vehicle or the keys," *id.* at 155, 99 S.Ct. at

436, suggesting that had they had such control, they could have had the requisite degree of interest.

■ Under a similar analysis, Lopez could also assert a legitimate expectation of privacy because exclusive control of the vehicle had been turned over to him. That conclusion need not be reached under these facts, however, since Lopez has properly pleaded his privacy interest by claiming possession of objects seized during the search.[6]

## II.

This court does not address the question of the propriety of the initial detention of the defendants. Focus will instead be directed at the events that subsequently occurred. Those events were, in brief, the entry of the officer into the vehicle for the alleged purpose of inspecting the registration and the seizure of evidence as a direct result thereof.

While it has been determined that the defendants had a reasonable expectation of privacy in the vehicle, this court must now determine whether an unconstitutional intrusion indeed occurred. This inquiry rests upon the "reasonableness" of the intrusion: "[T]he permissibility of a particular law-enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interest." *Delaware v. Prouse,* 440 U.S. 648, —, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).

■■ Inspection of registration by law enforcement officers can be justified, in the abstract, based upon the officers' legitimate interest in insuring the vehicle has met the registration requirements and that the operator is properly in possession of the vehicle. California has enacted various code sections to further those interests. In particular, under § 2804[7] of the California

---

6. Lopez testified that the contents of both bags were his and that he had written the "pollo" list under Santiago's direction.

7. California Vehicle Code section 2804 states:

A member of the California Highway Patrol upon reasonable belief that any vehicle is being operated in violation of any provisions of this code or is in such unsafe condition as to endanger any person, may require the

Vehicle Code, officers have the statutory authority to enter the vehicle to inspect the registration. The government takes an expansive reading of § 2804, contending that it allows officers to enter a vehicle and conduct a search without obtaining consent from the operator, without asking the operator its location, or without requesting the operator to present the document.

■ This court does not agree. The interest is not so compelling as to justify an unrestricted search of the vehicle for the registration. Balancing the intrusion and the interest compels a reasonable attempt to procure the registration before an unconsented entry can be sanctioned. While the facts and circumstances will dictate what is reasonable, at a minimum, an inquiry should be made by the officers as to the whereabouts of the registration prior to the entry.

In *Jackson v. Superior Court,* 74 Cal. App.3d 361, 142 Cal.Rptr. 299 (1977), a similar conclusion was reached. In *Jackson,* the officers, after stopping the accused because of erratic driving, searched the vehicle for the registration without first inquiring as to its whereabouts. After the motion to dismiss was denied by the superior court, petitioner sought a writ of mandate. The writ was granted, based, *inter alia,* upon the court's view that the search was improper because of the failure of the officers to first conduct any verbal inquiry:

> We hold that an officer may enter a vehicle to check on the registration in limited circumstances. We agree with the People that "numerous California cases hold that Vehicle section 2805 authorizes an officer under reasonable circumstances to enter a vehicle for the purpose of investigating its title or registration."
>
> The purpose of Vehicle Code section 2805 is to enforce the registration laws and to

check on stolen vehicles and parts. Nevertheless, we believe that to balance such purposes and the right to privacy (see Cal.Const., art. I, § 13, and art. I, § 1), when the vehicle is occupied, *the officer must first inquire as to the location of the registration slip in the vehicle before entering to obtain it.*

*Id.* at 367, 142 Cal.Rptr. at 302–03 (footnote omitted) (emphasis added). While the officer's actions were found unconstitutional under the state constitution, such actions are equally inimical to those rights secured by the fourth and fourteenth amendments.[8]

■ Even if the officer's entry to inspect the registration was justified, the manner in which the search was conducted was violative of the defendants' rights. Balancing of the interests mandates that the scope of the search not exceed that which is reasonably necessary to effectuate the purpose for the initial entry into the vehicle. The officer must limit his search only to those areas of the vehicle where the registration is likely to be found. Without such a proscription, this exception would unquestionably undermine fourth amendment protections.

■ Turning our attention to the present case, the officers passed over valid proof of registration within plain view, affixed to the windshield above the glove compartment which was searched by the officers. This court views the failure to notice the registration under such circumstances with utter incredulity. Additionally, the officer disregarded a folded piece of paper on the dash. Instead, the officer directed his probe to the contents of a crumpled fast-food bag, which was highly more likely to have held the refuse of a meal rather than the registration. He asserts that registrations have been known to be carried in bags. However, the parameters of a lawful search are not delimited by personal eccentricities, but rather it is the reasonable like-

driver of the vehicle to stop and submit to an inspection of the vehicle, and its equipment, license plates, and registration card.

8. California Vehicle Code section 2805 is similar to section 2804 and states:
A member of the California Highway Patrol may inspect any vehicle of a type required to

be registered under this code on a highway or in any public garage, repair shop, parking lot, used car lot, automobile dismantler's lot, or other similar establishment, for the purpose of locating stolen vehicles, investigating the title and registration of vehicles, or inspection of vehicles wrecked or dismantled.

lihood of finding the registration which delineates the propriety of the search. Certainly the windshield or a single piece of paper might be investigated before a crumpled fast-food bag. It is patently unreasonable for officers to so selectively search for registration documents of an area unlikely to hold such documents, if indeed that was their goal, and not check the more obvious locations for adequate proof of registration.

As for the discovery of the undocumented aliens themselves, no factors have been brought to the court's attention that would prompt someone to peek into the interior of the camper. There was no suggestion he feared for his safety and wanted to secure the vehicle, and no indication that something prompted him to think that the camper would hold relevant evidence for the otherwise unarticulated suspicions that "crime was afoot" or that a registration card would be found.

Lastly, this court finds no merit to the contention that discovery of the evidence was inevitable and thus should not be suppressed.