UNITED STATES of America

v.

**Michael Roland ROY.**

**Crim. No. N–83–15.**

United States District Court,
D. Connecticut.

Aug. 9, 1983.

---

Alan H. Nevas, U.S. Atty., Jeremiah F. Donovan, Asst. U.S. Atty., New Haven, Conn., for plaintiff.

Thomas G. Dennis, Federal Public Defender, Richard Reeve, Asst. Federal Public Defender, Hartford, Conn., for defendant.

## RULING ON MOTION TO SUPPRESS

ZAMPANO, District Judge.

In a three-count indictment returned by a federal grand jury on February 24, 1983, the defendant, Michael Roy, is charged with willfully possessing firearms in violation of 26 U.S.C. §§ 5861, 5871 and 18 U.S.C.App. § 1202. On April 4, 1983, Chief Judge Daly held an evidentiary hearing on Roy's motion to suppress evidence seized by local police from the interior and trunk of his car at the time of his arrest. Following the hearing, but prior to a ruling, Chief Judge Daly disqualified himself and transferred the case to the undersigned. With the consent of the defendant, the matter was submitted for a ruling by this Court on the briefs and moving papers previously filed, the transcript of the testimony before Chief Judge Daly, and a police report concerning Roy's arrest not previously produced by the government.

### I.

At approximately 8:00 P.M. on December 3, 1982, detectives John Mazzamurro and Henry Dodenhoff of the Rocky Hill Police Department drove into the Great Meadow Plaza, a local shopping center, on routine patrol. Most of the stores were open and doing a brisk holiday business. The detectives were particularly interested in any "suspicious activity," because of a recent rash of auto thefts, purse snatches and robberies at the Plaza.

The two officers parked their unmarked vehicle and commenced a surveillance of the area. They soon observed an orange, "beat up" Subaru automobile with Massachusetts license plates backed into a space on the south end of the parking lot. The two male occupants were sitting in a slouched position, were wearing hats draped over their foreheads, and were staring ahead as if "looking over the businesses." The detectives did not recognize either of the men, and had never before seen the vehicle in the area.

Based upon their "experience and expertise," the detectives assumed "that a rob-

bery was going to occur" and Mazzamurro therefore radioed a patrol car in the vicinity to come to the area to render assistance. Immediately after word was received that a police vehicle was headed toward the shopping center, Mazzamurro noticed that one of the occupants of the Subaru exited the car and proceeded toward the stores, nervously looking over his shoulder as if to see if someone were following him. At this point, the other occupant of the automobile, later identified as Roy, drove the car to the main entrance of the plaza. The detectives followed. Roy operated the vehicle at a normal rate of speed, stopped at the stop sign, and looked in both directions before making a left turn onto a main thoroughfare. Roy drove to the next intersection, put on his right signal light, and turned right. In the meantime, Mazzamurro requested the back-up patrol car to apprehend the person who exited the Subaru at the plaza.

As Roy approached the next intersection, the detectives pulled along side, flashed their badges, and ordered him to pull over. Roy complied. The detectives asked Roy for identification and, as he was removing his driver's license from his wallet, the officers heard a police radio transmission emitting from inside the vehicle. When Mazzamurro asked Roy for the source of the transmission, Roy started to reach down between his legs. Concerned for their safety, the officers reached into the car and physically removed Roy from the vehicle.

The police report, prepared by Dodenhoff who was not called to testify at the suppression hearing, states that as soon as Roy was removed from the car he was "placed under arrest for criminal intent to commit robbery." Mazzamurro, who did testify before Chief Judge Daly, recalls the sequence of events differently. Although he acknowledges that Roy was under restraint when taken from the vehicle, he testified that Roy was arrested only after the search of the car uncovered a police scanner underneath the driver's seat. Upon examination of the scanner, possession of which is not in and of itself illegal, Mazzamurro noted that the brand name and serial number of the scanner were defaced and, at that point, he

claims he arrested Roy for "altering an electrical device under Connecticut Statutes."

A resolution of this factual discrepancy is not crucial to the decision concerning the legal issues raised by the motion to suppress. Regardless of the nature of the exact charge placed against Roy, both officers agree that Roy was in custody and under restraint when he was forcibly removed from his automobile. However, it seems evident for several reasons that Dodenhoff's written record of Roy's arrest should be given greater weight than Mazzamurro's oral account at the hearing.

First, the police report was prepared within a relatively short time after Roy was arrested. The contemporaneous nature of the document imparts a stronger degree of reliability to the accuracy of its entries, than a verbal recitation based on recollection several months after the event. Second, Mazzamurro conceded at the hearing that he perused the police report the day after its preparation and at that time found it to be correct in all respects. Third, a review of the report's narrative, detailing the chronology of events, indicates that the alterations of the scanner were observed after Roy had been charged with a series of other crimes. Fourth, it seems highly unlikely that the extent of the police intrusion on Roy's liberty, including impounding his car, and the police alert to apprehend Roy's companion, were grounded merely on the suspicion that Roy had defaced a radio scanner with criminal intent, a misdemeanor under Connecticut law. Finally, the Court is satisfied that Mazzamurro at the hearing inadvertently reversed the sequence of events surrounding Roy's arrest. The Court finds that Roy was arrested on the scene for criminal attempt to commit robbery.

After Roy's arrest, the detectives searched the interior of the car and seized a ski mask, a hat and a pair of binoculars. The officers then called for a wrecker to tow away the car and requested Roy to open the trunk of his car. When Roy refus-

ed, the detectives removed the keys from the ignition, opened the trunk, and seized, *inter alia,* two 12 gauge sawed-off shotguns and a .25 caliber pistol.

Roy was then taken to police headquarters where he was processed as "James Allen Robinson," the name on the Oklahoma license Roy displayed to the police. Fingerprint analysis revealed his true name as Michael Roland Roy. Subsequent investigation disclosed that in the summer of 1982 Roy pleaded guilty to armed robbery and escape from prison in Illinois and was sentenced to a term of 15 years imprisonment. However, on October 3, 1982, he escaped from custody. In addition, Roy is wanted for murder in California and for bank robbery in both Florida and Massachusetts. Detainers are presently lodged against him on these charges.

### II.

■ A threshold question presented concerns Roy's standing to contest the alleged violation of his fourth amendment rights. See, e.g., *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424, 58 L.Ed.2d 387 (1978); *United States v. Kelly,* 529 F.2d 1365, 1368 (8 Cir.1976). The government contends that Roy, as a convicted felon who has escaped from prison, enjoyed no legitimate expectation of privacy in the vehicle he was driving at the time of his arrest. In essence, the government argues that a person who escapes from confinement retains only those limited constitutional rights possessed by a prison inmate and, therefore, the fourth amendment protections afforded unincarcerated members of society are not available to Roy. See, e.g., *Bell v. Wolfish,* 441 U.S. 520, 545–46, 558, 99 S.Ct. 1861, 1877–1878, 1884, 60 L.Ed.2d 447 (1979); *Lanza v. New York,* 370 U.S. 139, 143, 82 S.Ct. 1218, 1220, 8 L.Ed.2d 384 (1962); *United States v. Vallez,* 653 F.2d 403, 406 (9 Cir.1981), cert. denied, 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981).

The Court disagrees. It is clear that the limitations on constitutional rights in the *prison setting* are justified by "[t]he fact of confinement as well as the legitimate goals and policies of the penal institution. . . ." *Bell* 441 U.S. at 546, 99 S.Ct. at 1877. See also *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974) (a prisoner's constitutional rights "may be diminished by the needs and exigencies of the institutional environment"). No sound reason exists for limiting fourth amendment protections outside the prison context.

■ The government also claims that, because Roy offered no evidence during the suppression hearing to support a finding of ownership, he lacks standing to object to the search of the Subaru. This contention must be rejected. It is uncontroverted that at the time of his arrest Roy had complete and sole control over the vehicle and, thus, has the requisite interest to challenge its search. See, e.g., *United States v. Posey,* 663 F.2d 37, 41 (7 Cir.1981), cert. denied, 455 U.S. 959, 102 S.Ct. 1473, 71 L.Ed.2d 679 (1982); *United States v. Ochs,* 595 F.2d 1247, 1253 (2 Cir.1979), cert. denied, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979); *United States v. Lopez,* 474 F.Supp. 943, 946–47 (C.D.Cal.1979).

### III.

The government views the instant matter as an investigatory stop case and relies on the principles enunciated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny to sustain the constitutional validity of Roy's apprehension and the subsequent seizure of articles and weapons from his vehicle.

The short answer to this contention is that the circumstances surrounding the stopping of Roy's car involved restraint constituting an arrest, not a mere investigative "stop and frisk" under *Terry.* Prior to stopping the vehicle, the officers presumed that Roy and his companion had been engaged in criminal activity. Detectives Mazzamurro and Dodenhoff set out to apprehend Roy and also radioed instructions to fellow officers to take Roy's companion into custody at the Plaza. When Roy's vehicle was ordered to the side of the road, the officers approached the car, asked him several questions, physically removed him from

the vehicle, and immediately placed him under arrest for criminal attempt to commit robbery.

It is clear that, at the time Roy was placed under formal arrest and was not free to leave, the police lacked probable cause to restrain him. Probable cause exists "if the facts and circumstances known to the [arresting] officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). See also *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959); *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); *United States v. Vasquez,* 638 F.2d 507, 520 (2 Cir.1980), cert. denied, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981).

■ On the record here, reasonably cautious officers would have no basis for believing that Roy had committed, was committing, or was about to commit a crime. The detectives were not acting on an informant's tip, Roy was not known to the officers before they first noticed him at the Plaza, he was not operating a stolen vehicle, and he performed no act which could be construed to be a criminal offense. After leaving the Plaza, Roy violated no traffic laws and, being miles away from the Plaza, was incapable of committing a robbery at the shopping center. Moreover, the fact that the subsequent search disclosed incriminating evidence cannot justify the arrest. See, e.g., *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–418, 9 L.Ed.2d 441 (1963); *Henry,* 361 U.S. at 103, 80 S.Ct. at 171–172; *United States v. Hall,* 557 F.2d 1114, 1116 (5 Cir. 1977), cert. denied, 434 U.S. 907, 98 S.Ct. 308, 54 L.Ed.2d 194 (1977).

### VI.

■ Even assuming arguendo, contrary to the police report, that Roy was not arrested at the time he was removed from the vehicle, but rather was arrested after detective Mazzamurro observed the defaced scanner, the Court is satisfied that the defendant's motion to suppress must be granted.

Under the *Terry*-stop rationale, which provides an exception to the fourth amendment's probable cause requirement, police officers may briefly detain and question an individual if there exist "specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. As the Supreme Court stated in *Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972):

[T]his Court [has] recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary ... it may be the essence of good police work to adopt an intermediate response... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be the most reasonable in light of the facts known to the officer at the time.

In *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Supreme Court expanded *Terry* and *Adams* to include the investigative stopping of automobiles based on reasonable suspicion that criminal activity is occurring.

The Government's argument that the detectives reasonably suspected Roy of wrongdoing rests on the following factors: the "experience and expertise" of the officers, the vantage point of Roy's vehicle in the parking lot at the Plaza, the position of his hat over his forehead, the lack of conversation between Roy and his companion, the "beat up" look of the Subaru bearing

out-of-state license plates, the passenger's departure from the car "looking over his shoulder," and Roy's cautious operation of the automobile after leaving the Plaza.

In this Court's opinion, the circumstances preceding the detectives' detention of Roy do not satisfy the requisite minimum level of reasonable suspicion that he was engaged in some criminal activity. There is certainly nothing unusual about two men wearing hats on a December night sitting in an automobile parked in a Plaza during a busy and heavy holiday shopping period. Detective Mazzamurro admitted that Roy's vehicle was situated in a way typical for a driver to observe a friend he planned to meet, or to greet a shopper leaving one of the stores. The occasional over the shoulder backward glance by Roy's companion as he walked away from the car cannot form the basis of a fair inference of criminal activity by the detectives; rather, this conduct supports only an "unparticularized suspicion" or "hunch" that the person was about to commit an illegal act. See *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). Compare *United States v. Beck,* 602 F.2d 726, 729 (5 Cir.1979) (two black men sitting in parked car with engine running near a store in a high-crime neighborhood not sufficient to support officer's belief that "criminal activity was afoot.") with *United States v. Bull,* 565 F.2d 869, 871 (4 Cir.1977) ("stop and frisk" upheld where defendant and companions were in shopping area at night after most stores closed, hid their faces, and pantyhose protruded under their hats), cert. denied, 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978).

The Court appreciates the weight to be given to the officers' "experience and expertise" in detecting criminal activity. However, "if undue reliance is placed upon an agent's 'perception' or 'interpretation' of observed conduct, then the requirement of specific, objective facts may easily be circumvented." *United States v. Buenaventura-Ariza,* 615 F.2d 29, 37 (2 Cir.1980). As stated in *United States v. Montgomery,* 561 F.2d 875, 879 (D.C.Cir.1977):

The inarticulate hunch, the awareness of something unusual, is reason enough for officers to look sharp. Their knowledge and experience identify many incidents in the course of a day that an untrained eye might pass without any suspicion whatever. But awareness of the unusual, and a proper resolve to keep a sharp eye, is not the same as an articulated suspicion of criminal conduct.

See also *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979); *United States v. Rias,* 524 F.2d 118, 121 (5 Cir.1975).

Finally, whatever the basis for the officers' belief that Roy was about to commit a robbery of one of the stores at the Plaza, that justification for a *Terry* stop evaporated after Roy had left the Plaza and was traveling away from the scene. It cannot be fairly contended that, by the time and at the place the detectives decided to halt Roy's car, the officers could reasonably believe he had committed or was about to commit a crime. See *Posey,* 663 F.2d at 41; *United States v. Shipp,* 566 F.2d 528, 529 (5 Cir.1978).

For the above reasons, the defendant's motion to suppress is granted.