UNITED STATES of America

v.

Richard William DAVIS.

No. 2:04–CR–0171–F.

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 12, 2005.

Susan R. Redmond, U.S. Attorney's Office, Montgomery, AL, for Plaintiff.

Joseph Peter Van Heest, Federal Defenders, Montgomery, AL, for Defendant.

## ORDER

FULLER, District Judge.

After an independent review of the file, it is the

ORDER, JUDGMENT and DECREE of the court that:

(1) The objection (Doc. # 27) filed by government on December 20, 2004 is over-ruled;

(2) The Recommendation of the United States Magistrate Judge (Doc. # 22) entered on December 17, 2004 is adopted;

(3) The defendant's Motion to Suppress Evidence and Statements is GRANTED.

## RECOMMENDATION OF THE MAGISTRATE JUDGE

BOYD, United States Magistrate Judge.

Following due consideration of the parties' written submissions and the evidentiary hearing, the Magistrate Judge concludes, as herein explained, that Defendant's *Motion to Suppress Evidence and Statements* (Doc. 12, filed September 24, 2004) is due to be GRANTED.

## I. FACTS[1]

Montgomery Police Department ("MPD") Detective W.D. Favor ("Det.Favor") and his partner responded to a "police radio" report of a robbery around 2:02 p.m. on Friday, April 2, 2004. Det. Favor described as follows the *only* information he received:

> We received information that a black male had been robbed in the area of Jackson Street and High Street by six to eight black males. We were advised that he was selling jerseys on the side of the street, and a black—and a car, a

cream-colored vehicle thought to be a Cutlass-type vehicle, pulled alongside, and they got out and robbed him at gunpoint.[2]

Headed to the robbery site just a couple of blocks away from his location behind MPD headquarters, Det. Favors became aware from another radio transmission that the suspected vehicle—occupied by just one black male—had been pulled over by Det. Loria near the corner of South Jackson and High Streets. Consequently, Det. Favors "turned onto High Street to make a circle of the area to see if any of the other suspects were walking away from the vehicle."[3] He saw two young black males wearing jerseys "walking in the area of High Street, just up from Watts Street [which is] the back side of Tulane Court", a housing project acknowledged by Det. Favors to be populated primarily by African Americans. Because "they fit the physical description, being young black males ... wearing jerseys, and jerseys were stolen from the victim", the defendant, Richard William Davis ("Davis") and his "young juvenile" companion were summoned to the police vehicle pulled over in front of them.[4] In direct testimony, Det. Favors described the stop as being "within a half a block from where the [suspected] car was stopped", but cross-examination pinpointed an area at least two blocks or approximately 100 yards away from the car stopped "actually on South Jackson Street."[5] Indisputably,

1. In opposition to the suppression motion, the United States advised that "[t]he facts, as represented by Davis, are not contested by the Government." *Response to Defendant's Motion to Suppress ("Response")* at 1, Doc. 13, filed September 29, 2004. The evidentiary hearing on October 19, 2004, provided testimony only from the arresting officer and revealed no dispute on the relevant facts now summarized.

2. *Tr.* at 5: 12–17.

3. *Tr.* at 6–7: 1–9; 26: 14–19.

4. *Tr.* at 7–8; 10:1–2; 22: 16–21. Though admitting that other black males could have been in the area at the time, Det. Favors could recall only these two, who were walking in front of the nearby Chevron service station, "a service station attendant and someone up there working on a car." *Id.* at 7:23–25, 8:1–4; 18:14–25.

5. *Tr.* at 26:14–25; 27.

> Q: Now, between that corner where that car was found—where a car was stopped

though, Det. Favor did not see Davis exiting or walking from the stopped vehicle: ... [W]hen I came up on Jackson [street], I could see where Sergeant Loria had the vehicle stopped. When I made the left [turn] and started down High Street, I could see these two gentlemen walking right in front of the Chevron station. That's why I stopped them. They were in the area. They were two black males fitting the description wearing jerseys, and I was simply checking them out. I didn't—there's no need—I wasn't jumping out, throwing them on the car and arresting them or anything like that. It was simple—I just—you know, it would be—it would be dereliction of my duty if I did not stop them and see if these were possibly suspects. I was polite to them, they were polite to us, and everything went well.[6]

Both Davis—remembered by Det. Favor as being "very, very compliant ... behaved very well"—and his companion honored the officers' instructions to place their hands on the vehicle and, in the interest of "officer safety", they were subjected to a "routine pat-down of their outer garments for weapons." When Det. Favor "patted down [Davis'] right side, in the front waistband on the right side [he] felt a hard object, felt like a handle of a weapon," and he removed a 9 mm. semi-automatic pistol which is the subject of this suppression motion and the sole evidentiary basis for the federal indictment filed against Davis on August 17, 2004. While being frisked, Davis supplied his full name, his 19-year old age, and after acknowledging his lack of a gun permit, Det. Favor "placed him in custody for violation of license to carry a pistol." The pat-down search also uncovered from Davis' left front packet a total of $394.11 along with two small bags of what appeared to be marijuana, and seized from his right front pocket was "a small plastic bag containing several off-white rock substances believed to be crack cocaine."[7] Before transporting Davis to the MPD, the detectives excluded him as a suspect in the reported robbery.[8]

and the Chevron station, there is Sharp Street; is there not?
A: Sharp Street running right next to the Top Flight—or the Rose Supper Club? Is that what you're talking about?
Q: Yes.
A: Yes.
Q: Okay. And there's also Ross Street before Watts Street' is that correct?
A: Well, Ross Street is very close to where the Chevron is, right there. All those ... blocks are—on one side, you don't have any streets. On the other side, you have several short little streets. I mean you're looking at possibly—if you want—instead of saying blocks, if you want to say yardage, you're looking probably a hundred yards from the corner of High and Jackson is where I stopped him.
*Id.* at 26:25; 27: 1–15.

6. *Tr.* at 28:6–20.

7. *Tr.* at 10: 11–18.; 13–14: 1–4. Count 1 of the Indictment charges an 18 U.S.C. § 922(g)(3) crime—knowing possession of a firearm, in and affecting commerce, while being an unlawful user of and addicted to marijuana. Charged under 18 U.S.C. § 924(c)(1)(A)(i), Count II alleges that Davis "did knowingly use and carry, during and in relation to, and possess in furtherance of a drug trafficking offense, namely possession with intent to distribute cocaine base, ... a firearm."

8. Prior to stopping Davis, Det. Favors did not speak with the robbery victim, explaining: "Det. Hameed handled the robbery of the person with the jerseys. Once I had all this on my hands, we had a whole separate event." Once we "brought him back to where Sgt. Loria had the car stopped, they brought the [robbery] victim [Marcus Lee] by and the victim simply said that [Davis] wasn't him. At that point, we released the younger boy to his mother, who lived right close by, and we took [Davis] to headquarters." *Tr.* at 16:4–16.

## II. DISCUSSION

### A. Analytical Framework

For his motion to suppress the firearm, drugs, and currency seized from his person along with his post-arrest statements at police headquarters, Davis posits this issue: *"Whether the police had .reasonable suspicion to believe Mr. Davis was involved in criminal activity, and if so whether he was armed and dangerous, sufficient to stop and frisk him on the street."* The United States responds: *"The gist of Defendant's argument is that police lacked reasonable suspicion to believe that . . . Davis was involved in an armed robbery and, that, even if police had such reasonable suspicion, said suspicion was insufficient to permit police to stop and frisk Defendant's argument is incorrect."* [9] Resolution of the parties' dispute triggers application of the analytical framework established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) for an officer's warrantless investigatory stop of a citizen upon the officer's reasonable, articulable suspicion of his criminal activity.

To evaluate the reasonableness of an investigative stop, the court is required under *Terry* to make. a "dual inquiry," examining first "whether the officer's action was justified at its inception," *United States v. Powell*, 222 F.3d 913 (11th Cir. 2000) (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. 1868), which turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime. *Id.* The second *Terry* inquiry is whether the investigative stop was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868.

■ With regard to the initial inquiry—indisputably the dispositive focus on this record—the officer's "reasonable suspicion" cannot be based on merely an "inchoate and unparticularized suspicion or hunch." *Id.* at 27, 88 S.Ct. 1868; *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Jackson v. Sauls*, 206 F.3d 1156 (11th Cir.2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). "A search or seizure is ordinarily unreasonable in the absence of [at least some] individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000).

■ In assessing the requisite "reasonable suspicion," the court "must look at the 'totality of the circumstances' surrounding each case to see whether the detaining officer has a 'particularized and objective basis' for suspected legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citation omitted). As explained in *Arvizu*, "[t]his process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (citation. omitted). The totality of the circumstances must support a finding of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop and frisk. *United States v. Hunter*, 291 F.3d 1302 (2002) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868). A fair consideration of the "totality of the circumstances" means that the court should not rest its analysis on a consider-

---

**9.** *Motion.* at 1, ¶ 1; *Response* at 1, ¶ 1a.

ation of each fact in isolation. *Hunter, id.* at 1306 *(citing Arvizu)*

### B. Analysis

█ When Det. Favor stopped Davis, these facts supplied to him entirely by the MPD radio dispatcher formed the "totality of circumstances" within his knowledge: *a black street vendor of jerseys, while selling in an area near South Jackson and High streets, reported the mid-afternoon robbery of his jerseys at gunpoint by 5 or 6 young black males traveling in a cream-colored vehicle similar to an Oldsmobile Cutlass.* By his admission, the detective stopped Davis and his juvenile friend, because they fit the "physical description, being young black males," they were wearing jerseys, and they were walking in the vicinity of the crime. Thus, the question is whether these additional facts infused the totality of circumstances sufficiently to create a reasonable suspicion that these males had participated in the reported robbery and accordingly could be subjected to a brief, warrantless stop for an investigative inquiry.

Pertinent to this analysis is the undisputed fact that prior to stopping Davis, the detective lacked any knowledge from any source regarding (a) the robbery suspects' height, weight, skin color, clothes, or any other identifying features; (b) whether the suspects had been seen carrying anything in their hands; (c) the quantity, quality, color, type, or other descriptive features for the jerseys stolen, and how they were packaged at the time of the theft; (d) whether the victim or any witness saw any of the suspects wearing one of the stolen jersey; (e) the quantity and type of gun(s) used in the robbery.

Similarly relevant are the facts added to the "totality of circumstances" by the officer's personal observations as he drove to the reported area of the robbery. Before seeing and stopping Davis, Det. Favor saw that another detective had stopped the suspected vehicle and its occupant on South Jackson Street near its intersection with High Street. Both Davis and his friend became visible to Det. Favor only after he turned off Jackson Street onto High Street, and neither was spotted in, walking or running from the vehicle stopped on Jackson Street,[10] notwithstanding Det. Favor's stated suspicion that they had been in the vehicle.[11]

---

10. Det. Favor testified that he first glimpsed Davis and his companion walking in the parking lot of the Chevron: Whether they turned and walked towards us when they saw my vehicle, whether they were walking the other way, I don't know. But they were walking in the parking lot of the Chevron, yes.

> Q: But they were at least a hundred yards away from this car that had been stopped; is that right?
> A: That's correct.
> Q: And as far as you know, they had not been seen by you walking out—getting out of that vehicle, right?
> A: No, they hadn't.
> Q: And in fact, Detective Loria is the one who stopped that vehicle.
> A: That is correct.
> Q: And he did not tell you that he had seen anybody exiting that vehicle when he pulled it over, correct?

> A: No. He didn't put it out on the radio. No.
> *Tr.* at 41–42

11. Asked to confirm his absence of knowledge that Davis and his companion had been in the vehicle stopped, Det. Favor responded: "Only my prior experience with pulling over vehicles, prior experience with—I had six subjects rob somebody. We had a suspect vehicle parked. One person is in that vehicle. Other people went somewhere if that is in fact the correct vehicle. I don't—it's a time frame here where you don't have time to wit. You know, five, ten minutes, 20 minutes for all that information to get out on the radio. The problem is, at this point, they've got a suspect vehicle stopped; I've got young men fitting the physical description wearing jerseys; jerseys were stolen. I stopped those young men to find out whether or not they had any involvement in it. Like I say, everybody was

Additional facts of relevance became apparent to the officers from their pre-stop observations of Davis and his companion. They did not appear to be loitering in the area, trespassing on any private residences or property, or walking with no purpose or direction; they were not then engaging in criminal activity, and the officers found nothing at all suspicious about their walk or gait or presence on the High Street sidewalks. Additionally, they were walking in an area around the corner from and at least two blocks or 100 yards away from the vehicle stopped for investigation on Jackson Street. Neither the time of day—a Friday afternoon in April around 2:00 p.m.—nor any reported bad weather on that day, raised any suspicion that a criminal purpose tainted their presence. Their reaction to the police vehicle and police officers did not contribute to reasonable suspicion as they did not flee, appear nervous or agitated, or respond in any hostile or threatening manner; to the contrary, the detective complimented their compliant behavior. It does not appear that they had any awareness of the suspicious vehicle stopped on Jackson Street.

The location of these two pedestrians did not appear suspect as Det. Favor conceded that it was not at all unusual to see two young black males walking in a residential area heavily, if not exclusively, populated by Blacks.[12] As for the jerseys worn by Davis and his companion,[13] this fact could add little to the officer's "reasonable suspicion" radar because he possessed no description at all about the jerseys stolen or whether any thief garbed himself with a jersey, moreover, the sight of young males—regardless of race or region—wearing athletic jerseys in public is far too commonplace to provoke any particularized suspicion.

 Viewed against this "totality of circumstances" backdrop, the fact that Davis and his companion fit the reported description of the robbery suspects as "young black men" cannot create the degree of reasonable suspicion necessary to warrant a *Terry* investigative stop.[14] While this court can appreciate this officer's experience in detecting criminal activity and his usual investigative practice, it remains mindful that "if undue reliance is placed upon an agent's 'perception' or 'interpretation' of observed conduct, then the requirement of specific, objective facts may be easily circumvented." *United States v. Roy,* 568 F.Supp. 1127, 1131 (D.Conn.

polite. They went back with us afterwards, and I turned the younger one over to his mother." *Tr.* at 44–45.

**12.** Although it is unnecessary to do so given the testimonial evidence, this court could take judicial notice that the Tulane Court housing development is exclusively occupied by African Americans, and young black males comprise a substantial portion of the apartment dwellers, while African Americans occupy almost exclusively the adjacent residences along the streets bordering the South Jackson and High Street areas (commonly known as the Centennial Hill community in Montgomery)

**13.** The incident report described Davis as "wearing a black Pacers jersey and blue shorts." *Tr.* at 32: 15–18. That Det. Favors

could not recall the style or numbers on the jersey sufficiently to identify it (*Tr.* at 33–34) suggests that nothing about the particular jersey worn by Davis raised a suspicion that it had been stolen.

**14.** *See, e.g., United States v. Jones,* 242 F.3d 215, 218 (4th Cir.2001) (no reasonable suspicion when tip solely described race and officer pulled over car despite lack of traffic or equipment violations); *United States. v. Rias,* 524 F.2d 118 (5th Cir.1975) ("reasonable suspicion" lacking for officer who stopped two black males because they were in a black Chevrolet when officer knew only that two black males in a black of blue Chevrolet were suspected in a series of robberies, the last of which had occurred at least two weeks earlier)

1983).[15] Clearly lacking on this evidentiary record is a particularized and objective basis for any reasonable suspicion by Det. Favors of criminal wrongdoing by Davis. Accordingly, Davis must not be denied the Fourth Amendment's protection against unreasonable seizures.[16]

■ But for the officer's unjustified "stop" of Davis, he would not have been subject to the frisk conducted as "a routine pat-down of ... outer garments for weapons" in the interest of "officer safety."[17] The court rejects Davis' argument that the frisk could be sustained—assuming legality of the initial stop—only by the officer's "reasonable belief that [Davis] was armed and presently dangerous" and finds no basis for concluding that the frisk exceeded the permissible scope of any lawful *Terry* stop.[18] Since the officers' stop of Davis cannot be justified as a lawful *Terry* stop, however, all evidentiary fruits of the frisk as well as post-arrest statements are "fruits of the poisonous tree" which must be suppressed as well. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## III. CONCLUSION

Based on the findings of fact, legal reasoning and conclusions stated, it is the Recommendation of the Magistrate Judge that the defendant's *Motion to Suppress Evidence & Statements* (Doc.12, September 24, 2004) be **GRANTED.**

It is further

**ORDERED** that the parties shall file any objections to the said Recommendation within a period of 13 days from the date of mailing or transmittal to them. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final

15. *See also Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) ("the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests"). In "declin[ing] to ... craft another exception to the Fourth Amendment's general requirement of individualized suspicion," recently the Eleventh Circuit, in *Bourgeois v. Peters,* 387 F.3d 1303 (11th Cir.2004), emphasized as follows the Supreme Court's reminder in *Chimel v. California,* 395 U.S. 752, 765, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) that discussions of reasonableness 'must be viewed in the light of established Fourth Amendment principles':

> Conducting an *ad hoc* analysis of the reasonableness of the search based on the judge's personal opinions about the governmental and privacy interest at stake, instead of applying the Supreme court's well-established *per* se rules regarding warrants, prior judicial scrutiny of proposed searches, probable cause, and *individualized suspicion* ignores these crucial Fourth Amendment principles. The need to apply these

*per se* rules reaches *all* searches, whether of the home, office, *person,* or other location. (*emphasis added*)

16. A seizure for Fourth Amendment purposes occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975),

17. *Tr.* at 8:15–18.

18. Reasonable suspicion that a person is engaged in criminal activity entitles police officers to stop that person, question him for a brief time, and frisk him for weapons. *See Terry,* 392 U.S. at 22–24, 88 S.Ct. 1868. The standard articulated in Terry for a post-stop frisk is whether "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of officers was in danger." *Id.* at 27, 88 S.Ct. 1868. Given his understanding that the just-concluded robbery was at gunpoint, Det. Favor's concerns for "officer safety" were not unreasonable. *See Tr.* at 8: 18–25; 9:1–6.

order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir.1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.