# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Remanded by the Supreme Court August 28, 2012

## STATE OF TENNESSEE v. CHARLES E. LOWE-KELLEY

**Appeal from the Circuit Court for Maury County**
**No. 17948      Stella Hargrove, Judge**

**No. M2012-01933-CCA-RM-CD - Filed November 20, 2012**

A Maury County Circuit Court jury convicted the defendant, Charles E. Lowe-Kelley, of two counts of premeditated murder, two counts of felony murder, and nine counts of attempted first degree murder. At sentencing, the trial court imposed consecutive sentences of life with the possibility of parole for each premeditated murder conviction, merged the felony murder convictions into the premeditated murder convictions, and imposed concurrent sentences of 15 years' incarceration for each attempted first degree murder conviction to be served concurrently with the two life sentences. In addition to contesting the sufficiency of the evidence on appeal, the defendant contends that the trial court erred by (1) denying his motion for a continuance, (2) allowing a juror to remain on the jury who expressed an opinion about the case, (3) admitting evidence without establishing a proper chain of custody, (4) admitting a tape-recorded conversation between the defendant and a separately-tried co-defendant, and (5) imposing consecutive sentences. On initial review, we concluded that all issues except the sufficiency of the evidence and sentencing were waived because the defendant failed to file a timely motion for new trial. *See State v. Charles E. Lowe-Kelley*, No. M2010-00500-CCA-R3-CD (Tenn. Crim. App., at Nashville, Feb. 14, 2011). The petitioner applied for permission to appeal this court's decision to the Tennessee Supreme Court pursuant to Rule 11 of the Rules of Appellate Procedure. On August 28, 2012, the supreme court ruled that the defendant's motion for new trial was timely and that the trial court properly allowed amendments to the motion for new trial and remanded the case to this court for consideration of the defendant's appellate issues. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Patrick T. McNally, Nashville, Tennessee (on remand); Robert C. Richardson, Jr. (at motion

for new trial and on appeal); and Mark K. Green (at trial), Columbia, Tennessee, for the appellant, Charles E. Lowe-Kelley.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Kimberly L. Cooper, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On April 13, 2008, the 16-year-old defendant, 20-year-old Robert Guerrero, 19-year-old Erick Guerrero, and 22-year-old Javoris Sparkman, shot at another vehicle containing 11 passengers while traveling on a Columbia highway. Two of the passengers, Patricia Garcia and Juan Castro, received fatal injuries, giving rise to the defendant's charges of two counts of premeditated murder and two counts of felony murder. Of the remaining nine passengers, two received injuries requiring hospitalization and seven others received no injuries. The defendant was charged with nine counts of attempted premeditated murder related to these victims. Following his arrest as a juvenile, the defendant's case was transferred to circuit court, where it proceeded via indictment to trial.[1]

The evidence at trial showed that on April 12, 2008, the defendant, his three separately-tried co-defendants, and the 11 victims attended a Quinceanera Party at the National Guard Armory in Columbia, Tennessee. One of the victims, Jose Castro, testified that the crowded party was "like a riot in there. Everybody was fighting." Columbia Police Department officers responded to reports of the fights at the Armory sometime after midnight that night. Some officers arrived early enough to "break up" the party and order the attendees to leave. Others arrived as most of the people were leaving the parking lot. Several of the officers recorded the scene in the parking lot on the dashboard cameras of their

---

[1] William C. Barnes, Jr., was initially appointed to represent the defendant throughout his juvenile proceedings and transfer to circuit court. The trial court allowed Mark K. Green to substitute as retained counsel on January 21, 2009, approximately seven weeks before the March 16, 2009 trial date. On March 16, 2009, the trial court appointed Mr. Green to represent the defendant based upon its prior indigency determination. Mr. Green represented the defendant throughout trial and sentencing. Mr. Green, however, withdrew from representation prior to the motion for new trial hearing because he had accepted employment with the district attorney's office. The trial court appointed Robert C. Richardson, Jr., to represent the defendant for the motion for new trial and on appeal. After the issuance of this court's opinion, Mr. Richardson filed a motion to withdraw, which this court granted on March 14, 2011. The defendant then filed a pro se application for discretionary review pursuant to Tenn. R. App. P. 11. On July 20, 2011, the supreme court granted the defendant's Rule 11 application and appointed Patrick T. McNally to represent the defendant in proceedings before the supreme court. On remand, this court appointed Mr. McNally to continue representation of the defendant.

cruisers; at least one of these videos showed the defendant leaving the parking lot with Robert Guerrero. Officer Jeremy Haywood recalled seeing Javoris Sparkman leaving the parking lot in a gold Pontiac.

Officer Tracy Duke arrived at the Armory to see a Hispanic male, later identified as Robert Guerrero, leaving the parking lot in a gold Pontiac Grand Prix. He recalled that Mr. Guerrerro was "clutching his pants" as if he were carrying a weapon. Officer Duke saw three other individuals in the car as it left the parking lot. Within minutes, Officer Duke responded to a report of an accident on Nashville Highway and arrived to discover the gold Grand Prix in a ditch. Robert Guerrero and his cousin, Erick Guerrero, were standing outside the vehicle and told officers that they had been run off the road. When officers discovered an SKS automatic rifle near the car, the two men were arrested. Neither the defendant nor Mr. Sparkman was found at the scene.

Officers Jeremy Humphrey, Brad Ribley, Scott Alexander McPherson, and Jeremy Haywood testified consistently with Officer Duke's account of the events leading to the Guerreros' arrest. Each of the officers assisted in collecting evidence at the scene which was later sent to the Tennessee Bureau of Investigation (TBI) Crime Lab for analysis. Officer Haywood arrested the defendant on April 14, 2008. At his arrest, the defendant had newspaper clippings concerning the shooting and the Guerreros' arrest in his pants pocket.

Columbia Police Department Detective Jeremy Alsup was the lead detective on the investigation of the shooting. Upon learning that some shooting victims appeared at Williamson County Medical Center within a short time of the Guerreros' accident report, Detective Alsup went to the medical center to find several of the victims and their Ford Expedition still there. Jose Castro and Sarah Garcia, the two surviving victims who suffered injuries, had been transported to Vanderbilt University Medical Center by the time Detective Alsup arrived. Detective Alsup also testified regarding the transcription of a tape recording between the defendant and Erick Guerrero that was made while Erick Guerrero was incarcerated at the county jail.[2]

Columbia Police Department Officer Korey Cooper examined the victims' Ford Expedition. The vehicle was damaged by gunshots to the driver's side, many of which

---

[2] The transcript of the jail tape recording was utilized as an aid to the jury while they listened to the recording of the conversation at trial. The trial court correctly instructed the jury that the transcript was not evidence. Likewise, the transcript was admitted for identification purposes only. On appeal, the defendant alleges that the tape recording should have been excluded, citing *Bruton v. United States*, 391 U.S. 123 (1968). Although the defendant properly preserved this issue at trial, the defendant failed to include the tape recording in the record on appeal.

exited on the passenger's side. A .38 caliber bullet was found in the headliner of the Expedition. The windows were shattered and held together by tinting in some places. Officer Cooper determined that between nine and 10 rounds of ammunition were fired into the vehicle.

Several experts from the TBI Crime Lab testified regarding their findings. Special Agent Steve Scott, a ballistics expert, determined that a bullet recovered from Sarah Garcia's leg was fired from the SKS assault rifle found near the Guerreros' vehicle. He also determined that both Juan Castro and Patricia Garcia's fatal injuries were the results of bullets fired from the same .38 caliber handgun. The .38 caliber handgun, however, was never recovered. Special Agent James Russell Davis, II, analyzed gunshot residue swabs taken from the Guerrero cousins. The test results were inconclusive concerning Robert Guerrero and negative for the presence of gunshot residue for Erick Guerrero. Special Agent Miranda Teary performed microanalysis on paint chips found at the accident scene and determined that the samples matched the paint on both the gold Pontiac and the Ford Expedition. Special Agent Mark Dunlap performed deoxyribonucleic acid ("DNA") analysis on a green bandana and the SKS rifle found at the scene. The bandana contained DNA from both Erick Guerrero and the defendant. The SKS rifle contained DNA from Robert Guerrero and Mr. Sparkman but did not have any DNA from either Erick Guerrero or the defendant.

The defendant telephoned Tiffany Fuller, Robert Guerrero's girlfriend, at approximately 2:00 a.m. on April 13. He told Ms. Fuller that there had been "an accident" and that Robert and Erick Guerrero were still at the scene. He told Ms. Fuller that he ran from the scene. Ms. Fuller said that the defendant told her about the shooting but that he assured her that neither Robert nor Erick had fired a weapon. The defendant, however, never admitted to her that either he or Mr. Sparkman was a shooter.

The defendant spoke to Paul Bernie Swafford on April 14, 2008, and admitted to Mr. Swafford that he had been involved in the shooting "the night before out by the Coca Cola Plant." Mr. Swafford recalled that the defendant told him that "they had shot up a truck" and that the defendant had "an SKS and a .38." He said that the defendant described the shooting as "[a] cold hit." Mr. Swafford contacted the police and anonymously reported what he had learned.

Jason Fletcher drove the defendant to the Armory at approximately 11:00 p.m. on April 12, 2008. Mr. Fletcher went home and saw the defendant again the next day at approximately 1:00 p.m. when the defendant showed up on his front porch steps. The defendant told Mr. Fletcher that he needed to talk to him. Mr. Fletcher recalled that the defendant was wearing shorts and that his legs were "scarred . . . like he'd been running through thorns." The defendant told Mr. Fletcher that "a fight broke out" at the Armory and

that Robert Guerrero had handed him a gun and "told him to be ready." The defendant told Mr. Fletcher that they pulled up beside the victims' vehicle and started shooting. The defendant told Mr. Fletcher that Mr. Sparkman had the SKS rifle, that he had a .38 caliber handgun, and that he "emptied the clip." Mr. Fletcher told the defendant to leave his house. Although Mr. Fletcher did not contact the police, he did give a statement to the police once they contacted him.

Sarah Garcia, one of the attempted first degree murder victims, had never met any of the defendants prior to the night of April 12. She remembered Mr. Sparkman from the party because he wore distinctive clothing that included bright orange shoes.[3] After her boyfriend, Jose Castro, got into a fight, she and the other victims decided to go home. Jose Castro drove the Expedition while she rode in the front passenger seat. Carlos Landauro, Patricia Garcia, Jonathan Trugas, and Jose Valadiz rode in the middle row seat. Jason Castro, Leonicio Santas, Juan Castro, Jonathan Zaragoza, and Dalilia Cortinas rode in the cargo area with the third row seat folded down.

Jose Castro noticed someone following their vehicle and warned everyone to "sit down and sit still." Soon thereafter, a vehicle struck the Expedition and Sarah Garcia "saw . . . fire" coming from the other vehicle. Jose Castro threw Sarah Garcia down in the seat. She called for her sister, Patricia Garcia. When Patricia Garcia did not answer, Sarah Garcia looked in the back seat and saw that Patricia Garcia "was gone." Sarah Garcia realized that she and Jose Castro had also been hit by the gunfire. She recalled hearing Jose Castro's younger brother, Juan Castro, yell from the back of the Expedition that he had also been hit. Sarah Garcia never saw any of the occupants of the other vehicle. Jose Castro drove directly to Williamson County Medical Center. Sarah Garcia and Jose Castro were transported to Vanderbilt University Medical Center for further treatment.

Jose Castro recalled being followed by a vehicle while on his way to Franklin after leaving the party at the Armory. He admitted that he had been involved in a brief fight at the party with someone other than the defendants. He said that he had, in fact, never met any of the defendants. As Robert Guerrero's Pontiac approached the driver's side of the Expedition, the driver turned off the headlights. Suddenly, sparks were flying from the car, and Jose Castro realized that they were being hit by gunfire. He rammed the Pontiac off the road and rushed to Williamson County Medical Center. He knew that Sarah Garcia, Patricia Garcia, Juan Castro, and he had been hit. He recalled that his youngest brother, Jason Castro, yelled for him to hurry because Juan Castro had been hit.

Carlos Landauro sat behind Jose Castro in the second row seat of the

_____

[3] A single bright orange shoe was recovered at the scene near the gold Pontiac.

Expedition. He remembered seeing sparks flying from the approaching car. He said that everyone in the Expedition "ducked down." He was seated next to Patricia Garcia and recalled her being struck by gunfire. He could not see the occupants in the other car.

Jason Castro was ten years old on April 13, 2008. He recalled he left the party at the Armory with his family when all the fighting began. Jason Castro remembered seeing a car following them. He saw sparks fly from the car. He saw his brother, Juan Castro, get shot next to him in the back of the Expedition. He yelled for his brother, Jose Castro, to hurry to the hospital.

Doctor Amy McMasters, a forensic pathologist, determined that Patricia Garcia died from a single gunshot wound to her head. Doctor McMasters recovered a bullet from Patricia Garcia's brain that was analyzed by the TBI Crime Lab and determined to be one fired from a .38 caliber handgun. She also determined that Juan Castro suffered three bullet wounds to his torso. Two bullets were recovered from Juan Castro's chest and right shoulder. A third wound exited Juan Castro's chest, causing fatal damage to his heart and lungs. The bullets recovered from Juan Castro were also determined to have been fired from a .38 caliber handgun.

Based upon this evidence, the jury convicted the defendant of the premeditated murder of Juan Castro, the first degree murder of Juan Castro committed in the perpetration of an attempted first degree murder, the premeditated murder of Patricia Garcia, the first degree murder of Patricia Garcia committed in the perpetration of an attempted first degree murder, and nine counts of attempted first degree murder of the surviving victims. At the May 11, 2009 sentencing hearing, the trial court merged each felony murder conviction into the appropriate premeditated first degree murder conviction and imposed two life sentences with the possibility of parole to be served consecutively to one another based upon its finding that the defendant qualified as a dangerous offender. *See* T.C.A. § 40-35-115(4). The trial court imposed concurrent sentences of 15 years' incarceration for each attempted first degree murder conviction[4] and ordered the effective 15-year sentence to be served concurrently with the life sentences.

*I. Sufficiency of the Evidence*

We review the defendant's claim attacking the sufficiency of the evidence to

_____

[4] On appeal the defendant argues that the trial court misapplied certain enhancement factors in determining the length of the attempted first degree murder sentences. Although the trial court discussed certain factors, it ultimately imposed the minimum 15 year sentence for each attempted first degree murder conviction.

support his convictions mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979); *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters,* 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

The defendant contends that the evidence presented failed to show his involvement in the conviction offenses. The defendant admitted his involvement in the offenses to three different people, eye witnesses placed the defendant with the other passengers of the Pontiac, and forensic analysis placed the defendant in the vehicle. Accordingly, we conclude that the evidence is sufficient to support the defendant's convictions.

*II. Motion to Continue*

The defendant argues that the trial court erroneously denied his motion to continue the trial. The State argues that the trial court acted within its discretion in denying the defendant's motion for a continuance.

"[T]he granting or denying of a continuance is a matter which addresses itself to the sound discretion of the trial judge." *Moorehead v. State*, 409 S.W.2d 357, 358 (Tenn. 1966) (citing *Bass v. State*, 231 S.W.2d 707 (Tenn. 1950)). An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied the defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995) (citing *State v. Wooden*, 658 S.W.2d 553, 558 (Tenn. Crim. App. 1983)). "The burden rests upon the party seeking the continuance to show how the court's action was prejudicial. The only test is whether the defendant has been deprived of his rights and an injustice done." *State v. Goodman*, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982) (citing *Baxter v. State*, 503

S.W.2d 226, 228 (Tenn. Crim. App. 1973)).

In our review, the record does not establish that the defendant suffered any prejudice by the trial court's refusal to grant a continuance. The record reflects that the trial court substituted retained counsel on January 22, 2009, approximately seven weeks before the March 16 trial date.[5] At the March 10, 2009 hearing on defendant's motion to continue, trial counsel acknowledged that he had attended the February trial of a co-defendant in order to familiarize himself with the State's case and that original counsel had assisted trial counsel in preparing for the trial date. Under these circumstances, we cannot discern any prejudice from the trial court's denial of the motion to continue.

### III. Juror Disqualification

The defendant contends that the trial court erroneously allowed a prospective juror to be seated on the jury after the juror expressed knowledge and an opinion about the case. The State contends that the defendant has waived this claim by failing to challenge the juror for cause or exercise a peremptory challenge to remove the juror. The State also argues that, notwithstanding the defendant's waiver of the issue, the record does not establish any juror bias warranting the juror's discharge from the jury.

During general voir dire, the following exchange occurred between the prospective juror and the prosecutor when the prosecutor asked if anyone had prior knowledge of the facts of the case:

| | |
|---|---|
| Juror: | It seems like I have heard people talk about it. |
| Prosecutor: | . . . do you think you have an opinion about it or do you think you can't set aside what you heard? |
| Juror: | Yes, ma'am. |

Later, during questioning by defendant's counsel, another exchange occurred concerning the prospective juror's knowledge of the case:

| | |
|---|---|
| Juror: | I don't get the newspaper. |
| Counsel: | You don't get the newspaper. |
| Juror: | No, but I may have heard it today, and I[] |

---

[5] On the eve of trial, the trial court appointed counsel to represent the defendant based upon its previous determination of the defendant's indigency.

|          |                                  |
|----------|----------------------------------|
|          | remember hearing something about it. |
| Counsel: | You didn't form an opinion?      |
| Juror:   | No.                              |

"A court may discharge from service a grand or petit juror . . . for any other reasonable or proper cause, to be judged by the court. That a state of mind exists on the juror's part that will prevent the juror from acting impartially shall constitute such cause." T.C.A. § 22-1-105 (1994). Accordingly, the trial court retains "wide discretion in ruling on the qualifications of a juror," *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993) (citing *State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989)), and the trial court's ruling in this regard will not be overturned absent a showing of an abuse of that discretion, *Burns v. State*, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979). "[I]rrespective of whether the trial judge should have excluded the . . . challenged jurors for cause, any error in this regard is harmless unless the jury who heard the case was not fair and impartial." *Howell*, 868 S.W.2d at 248 (citing *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989)). When the defendant preserves the issue by exercising all of his peremptory challenges, "the failure to correctly exclude a juror for cause is grounds for reversal only if . . . an incompetent juror is forced upon him." *Howell*, 868 S.W.2d at 248 (citing *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988); *State v. Jones*, 789 S.W.2d 545, 549 (Tenn. 1990)).

The record reflects that the defendant failed to challenge the juror for cause or exercise a peremptory challenge.[6] For that reason, we deem this issue waived. *See State v. Jones*, 789 S.W.2d 545,549 (Tenn. 1990) (defendant cannot prevail on a claim that an incompetent juror was forced upon him unless he challenges the juror for cause and exercises a peremptory challenge against that juror). Furthermore, we agree with the State that the juror's responses do not indicate any bias or opinion that would have prevented the juror from acting impartially on this case. At most, the juror's responses to the prosecutor's questions were ambiguous concerning her ability to set aside any prior knowledge or opinion about the case. Her responses to defendant's counsel concerning the same, however, indicate that the juror had, in fact, not formed any opinion about the case. This issue avails the defendant no relief.

*IV. Chain of Custody*

The defendant contends that the trial court erroneously admitted into evidence three unfired ammunition cartridges found near the Pontiac on the night of the shooting, bullet fragments removed from Patricia Garcia's body, and the taped conversation between the defendant and a co-defendant without first establishing an adequate chain of custody with

---

[6] The record is silent as to whether the defendant exhausted his peremptory challenges.

respect to each item. The State argues that the defendant waived any issues regarding chain of custody issue by failing to object to the admission of the evidence at trial.

"Whether the requisite chain of custody has been established to justify admission . . . is 'a matter committed to the discretion of the trial judge and [t]his determination will not be overturned in the absence of a clearly mistaken exercise thereof.'" *Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 267 (Tenn. 2009) (quoting *Shell v. Law*, 935 S.W.2d 402, 409 (Tenn. Ct. App. 1996)). Accordingly, this court will not reverse the trial court's ruling on the chain of custody "unless the trial court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Although "it is 'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody,'" *Cannon*, 254 S.W.3d at 296 (quoting *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)), the general rule "does not require that the identity of tangible evidence be proven beyond all possibility of doubt," *id.* The State need not "call all of the witnesses who handled the item." *Id.* (citing *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). So long as the State can "reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.*

The State correctly notes that the defendant failed to object to the admission of the evidence at trial. Because he failed to lodge a contemporaneous objection, the defendant has waived our consideration of the propriety of the admission of the evidence. *See* Tenn. R. Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the part is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of the record stating the specific ground of objection if the specific ground is not apparent from the context[.]"); Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12 (Tenn. Crim. App. 1987). Furthermore, in light of the defendant's overall failure to challenge the authenticity or integrity of the evidence at trial, either by objection or cross-examination, we cannot conclude that any alleged error attendant with the admission of the evidence rose to the level of plain error.

-10-

*V. Admission of Tape Recording*

The defendant argues that the trial court erroneously admitted the tape-recorded conversation between himself and a co-defendant, Erick Guerrero, who was an inmate at the Maury County Jail at the time of the recording. His argument is two-fold: first, that the admission of the tape recording violated this court's holding in *State v. Crawford*, 783 S.W.2d 573 (Tenn. Crim. App. 1989), concerning the use at trial of illegally intercepted communications, and second, that the admission of the un-redacted conversation violated the holding of *Bruton v. United States*, 391 U.S. 123 (1968), concerning the use of a non-testifying co-defendant's statements against a defendant at trial. The State contends that the defendant has waived consideration of this issue by failing to object contemporaneously at trial.

The record reflects that the defendant did file a pretrial motion seeking exclusion of "any statements made by any and/or all of the co-defendants in the alleged crimes." In the pretrial motion, the defendant made vague reference, without citation, to *Bruton* in that he argued that the admission of any co-defendant statements would violate his right to confrontation. At the hearing on the motion, however, the defendant argued only against admission of any co-defendant statements containing references to gang-related activity, presumably via Tennessee Rule of Evidence 404(b). Regarding the tape-recorded conversation specifically, the defendant's counsel stated, "Obviously, I have the awareness of the tape. I have heard it. And I understand that that's gonna come in." Counsel, nevertheless, objected to the use of the transcript "because I don't know who transcribed it." Ultimately, the State agreed not to admit the statements of any non-testifying co-defendants, with the exception of Erick Guerrero's statements which were included in the jail-recorded conversation between the defendant and Erick Guerrero during which the defendant made several incriminating statements. Following discussion on the motion, the trial court stated, "[T]he Court agrees. . . . that [motion in limine is] granted really by agreement."

Without belaboring our discussion of this issue, we initially note that the record does not contain the actual recording that was admitted into evidence and played for the jury. "An appellate court may consider only evidence contained in the appellate record." *State v. Elliot*, 366 S.W.3d 139, 148 (Tenn. Crim. App. 2010) (quoting *State v. Smotherman*, 201 S.W.3d 657, 660 (Tenn. 2006)). It is the duty of the appellant to prepare an adequate record for appellate review. *See* Tenn. R. App. P. 24; *see also State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). We acknowledge that the transcript of the recording, which was utilized for the assistance of the jury during the presentation of the recording, was included in the record on appeal. The transcript, however, was not admitted into evidence, and the trial court properly instructed the jury that the transcript was not evidence. Thus, our review of the issue is constrained by the shortcoming in not including the recording in the record.

-11-

Furthermore, the record reveals that the defendant failed to object to the admission of the tape recording via *Crawford*. He cannot now present this argument for the first time on appeal. We also observe that conversations made on jail telephones are generally known to be subject to recording or monitoring by law enforcement. As this court has previously discussed, "We remain mindful that 'a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day.'" *State v. Hill*, 333 S.W.3d 106, 125 (Tenn. Crim. App. 2010) (quoting *Lanza v. New York*, 370 U.S. 139, 143-44 (1962)). It is apparent from both the arguments of counsel and the transcript of the conversation that the defendant was aware his conversation with Erick Guerrero occurred via a jail telephone. As to the defendant's argument via *Bruton*, the pretrial hearing on the motion indicates that the defendant abandoned this argument despite its being generally raised in the pleading itself. Under these circumstances, we discern no error in the trial court's admission of the tape-recorded conversation between the defendant and one his co-defendants.

*VI. Sentencing*

Turning to the defendant's allegation concerning the trial court's imposition of consecutive sentences, when a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is

high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b) (2006). The existence of a single category is sufficient to warrant the imposition of consecutive sentences, *see State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997), and indeed, "[e]xtensive criminal history alone will support consecutive sentencing," *id*. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn.1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used; the court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *Id*. at 937-39; *see State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

At the May 11, 2009 sentencing hearing, the trial court noted that the defendant, who was age 17 at sentencing, possessed a juvenile history spanning ten years. The defendant was first adjudicated unruly at age 8 and later, between the ages of 13 and 15, amassed over ten adjudications in juvenile court. The trial court correctly noted that three of the these juvenile adjudications would have been felonies if committed by an adult: two aggravated burglaries and one theft of property valued at over $1,000. The defendant admitted substantial illegal drug use ranging from his daily use of marijuana since age 13 to trying cocaine "a couple of times." The defendant was also on juvenile probationary release status at the time the present offenses were committed. Consequently, the trial court concluded that the defendant is "an offender whose record of criminal activity is extensive." T.C.A. § 40-35-115(b)(2).

In addition to finding that the defendant's extensive criminal history warranted the imposition of consecutive sentences, the trial court concluded that the defendant is "a dangerous offender whose behavior evidences little or no regard for human life and [who has] no hesitation about committing a crime when the risk to human life is high," *id*. § 40-35-

115(b)(4), commenting that "it's amazing more people were not injured or killed, because the windows were blown out [of the victims' vehicle], and the bullets were going into that vehicle with no regard for who was being hit." The trial court also found that consecutive sentences are necessary to protect the public from the defendant's future conduct and are reasonably related to the severity of the offenses. *See Wilkerson*, 905 S.W.2d at 937-39.

The defendant contends that the trial court should not have considered his juvenile history contained in the presentence report because, he claims, the presentence report does not contain certified copies of the adjudications and are, therefore, unreliable hearsay. Initially, we note that trial counsel conceded the validity of the defendant's juvenile history at the sentencing hearing. Additionally, we conclude that certified copies of the adjudications were not requisite to the trial court's consideration of the defendant's juvenile history and that the juvenile history contained in the presentence report may serve as the basis, in part or in whole, for a trial court's consecutive sentencing imposition pursuant to the extensive criminal history factor. *See State v. Adams*, 45 S.W.3d 46, 59 (Tenn. Crim. App. 2000) (trial court properly relied upon evidence of juvenile history contained in presentence report to impose consecutive sentences).

The defendant also makes the general argument that "one life sentence would seem to address the needs of society, the Courts and the [Defendant] more effectively and efficiently" than the two consecutive life sentences imposed by the trial court. It is our view, however, that the record supports the trial court's imposition of consecutive sentences. The defendant was 16 years old at the time of the crimes and had garnered 10 prior juvenile adjudications, three of which would have been classified as felonies if committed by an adult. His criminal history began at age 13, and his first unruly adjudication occurred at age 8. As noted by the trial court, the presentence report reflects that the defendant "has fought the [juvenile justice] system on any efforts of rehabilitation." Further, the circumstances of the crimes indicate the defendant's willingness to commit a crime when the risk to human life was high. The crimes in this case were severe and, in our view, warranted the imposition of consecutive sentences.

*Conclusion*

The evidence is sufficient to support the defendant's convictions and the trial court's imposition of consecutive sentences was appropriate. Having considered each of the defendant's remaining issues and determined none merit relief, we affirm the judgments of the trial court.

-14-

_____
JAMES CURWOOD WITT, JR., JUDGE